**UNITED STATES of America, Appellee,**

v.

**Ruby Davidson WALDEN and William Luther Walden, Appellants.**

**No. 72–1931.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 4, 1973.

Decided Jan. 10, 1974.

Frank B. Tavenner, Washington, D. C., for appellants.

Brian P. Gettings, U. S. Atty. (K. Gregory Haynes, Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

Ruby Walden and William Walden were convicted by a jury of violating the

---

federal firearms law's prohibitions against sales to minors and non-residents, 18 U.S.C. §§ 922(b)(1), 922(b)(3) and 924(a), and they appealed. The bulk of the government's proof of their guilt was the product of an undercover investigation carried out in large part by several Marines at the request of a Special Investigator of the Alcohol, Tobacco and Firearms Division of the U. S. Treasury Department. Defendants sought, both by pretrial motion to suppress and at trial, to exclude the testimonial evidence produced by the Marines' investigation on the ground that the investigation violated the Posse Comitatus Act of 1878, 18 U.S.C. § 1385, and various military regulations prohibiting use of the armed services to enforce civilian laws.

We do not think that the letter of the Act was violated. We conclude, however, that there was a violation of the regulations; but, because this case presents the first instance of which we are aware in which illegal use of military personnel in this manner has been drawn into question, we decline to impose the extraordinary remedy of an exclusionary rule at this time, or to reverse the judgments. We reserve, however, the possibility that such a rule may be called for should repeated cases involving military enforcement of civilian laws demonstrate the need for the special sanction of a judicial deterrent. We affirm the judgments entered on the convictions.

### I.

William and Ruby Walden, husband and wife, both worked in a department store in Quantico, Virginia, the site of a Marine Corps' base. Their convictions of federal firearms violations were based on the following *modus operandi*, which was established by testimony of three enlisted Marines [1] and a Treasury Agent, all of whom purported to be ordinary firearm purchasers while actually working as undercover agents. At the Waldens' suggestion, a minor or non-resident of Virginia, ineligible under federal law to purchase a firearm, would bring a qualified purchaser to the store to sign the federal firearm transaction record. While the qualified buyer appeared as the purchaser of record, the actual purchaser selected the weapon, paid the purchase price, and took possession. The Waldens would prepare a receipt showing transfer of the weapon from the qualified purchaser to the actual buyer. In the instance where the actual buyer was a minor, the receipt was made effective as of the date that the minor achieved majority.

### II.

The use of Marines as undercover investigators by the Treasury Department is counter to a Navy military regulation proscribing the use of military personnel to enforce civilian laws. Secretary of the Navy Instruction 5400.12 provides that:

[t]hroughout the United States, it is a fundamental policy to use civilian, rather than military, officials and personnel to the maximum extent possible in preserving law and order. In the Federal Government this policy is reflected by the Posse Comitatus Act (18 U.S.C. § 1385) which prohibits the use of any part of the Army or Air Force to enforce local, state, or Federal laws except as Congress may authorize. Although not expressly applicable to the Navy and Marine Corps, that act is regarded as a statement of Federal policy which is closely followed by the Department of the Navy. SECNAVINST 5400.12, p. 2 (January 17, 1969).

---

1. The parties dispute whether one of the undercover agents was still a Marine at the time of the three sales involved in this case. In light of our disposition of the case, it is not necessary to resolve this factual question.

Thus, though by its terms the Posse Comitatus [2] Act [3] does not make criminal the use of Marines to enforce federal laws, the Navy has adopted the restriction by self-imposed administrative regulation.[4] *Cf.* United States v. Heffner, 420 F.2d 809 (4 Cir. 1969).

■ The Navy's administrative extension of the policy of the Posse Comitatus Act does not contravene any congressional purpose to exclude Marines and other Navy personnel from the Act's

coverage. Congress omitted coverage of Naval forces presumably because the Act was a rider to an Army Appropriations Bill, and in its original form was designed to deny the use of the appropriation bill's funds for troops which violated the Act. *See* Act of June 18, 1878, § 15, 20 Stat. 152 (1878) (now 18 U.S.C. § 1385), Note, Honored in the Breach: Presidential Authority to Execute the Laws with Military Force, 83 Yale Law Journal 143 n. 96 (1973). The Act applies to the Air Force be-

---

2. The term "posse comitatus" is defined as "[t]he power or force of the county. The entire population above the age of 15, which a sheriff may summon to his assistance in certain cases; as to aid him in keeping the peace, in pursuing and arresting felons, etc. 1 Bl.Comm. 343; Com. v. Martin, 7 Pa. Dist.R. [219] 224." Black's Law Dictionary 1324 (rev'd 4 ed. 1968).

3. "[W]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise, to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both." 18 U.S.C. § 1385.

4. Secretary of the Navy Instruction 5400.12 was issued on January 17, 1969. Thus, it was promulgated after Deputy Secretary of Defense Paul Nitze issued DoD Directive 3025.12 on June 8, 1968, and before Deputy Secretary of Defense David Packard cancelled and replaced the 1968 DoD Directive with a new DoD Directive, dated August 19, 1971, having the same number. The two DoD Directives have a very similar format and much of the later is a verbatim copy of the earlier. However, the following part of the earlier Directive, relevant to this case, was not carried forward:

The Posse Comitatus Act (18 U.S.C. § 1385) prohibits the use of any part of the Army or Air Force to execute local, state or Federal laws except as Congress may authorize. *Although the Navy and Marine Corps are not expressly included within its provisions, the act is regarded as national policy applicable to all military services of the United States.* (Emphasis added). DoD Directive 3025.12 (June 8, 1968) 32 C.F.R. § 187.4(b) (1971), *superseded* by DoD Directive 3025.12 (August 19, 1971), 32 C.F.R. § 215.4 (1973).

However, the material in the part of the 1971 Directive in which this language was omitted was worded substantially differently

from its predecessor and contained significant new material. The implication of an intentional change in policy for the Navy and Marines is no stronger than the implication that the omission was simple inadvertance. The general thrust of the Directive —limiting use of the armed forces in civilian affairs and requiring high level authorization for the few exceptions—makes the implication of non-deliberate omission almost conclusive.

Furthermore, the hypothesis that the Department of Defense may have intended a change in policy by omitting the language extending the Posse Comitatus Act to the Navy in the second DoD Directive is rendered untenable by the continued effectivness of the Secretary of the Navy Instruction. The second DoD Directive concluded by stating in division XII on Implementation that:

A. Military department, JCS, and Defense agency directives, *instructions*, or plans for the use of military resources in the event of civil disturbances will be reviewed and revised as necessary within 60 days from the date of this directive: (1) to agree with the provisions of this directive, and (2) to conform with the policies and guidance promulgated by the DoD Executive Agent.

B. Implementing directives, instructions, or plans revised or developed by DoD components under assignment herein will be furnished to the DoD Executive Agent for review. (Emphasis added). (Not printed in Federal Register or Code of Federal Regulations).

In light of the command that subordinate agencies in the Department of Defense revise their regulations to conform with the DoD Directive, the Secretary of the Navy would have amended Instruction 5400.12 by deleting the language extending the Posse Comitatus Act to the Navy if any change in policy had been intended.

cause the Air Force originated as part of the Army and housekeeping legislation maintained the coverage of legislation formerly applicable only to the Army.[5] Thus, the failure to include the Navy in the text of the Act cannot be read as congressional approval of the use of Navy personnel to enforce civilian laws.

Indeed, consideration of the legislative history of the Act and interpretative opinions reveals a policy applicable to all of the armed services. *See e. g.* Wrynn v. United States, 200 F.Supp. 457, 464–465 (E.D.N.Y.1961). Congressman Knott, who introduced the bill, stated:

> But this amendment is designed to put a stop to the practice, which has become fearfully common of *military* officers of every grade answering the call of every marshal and deputy marshal to aid in the enforcement of the laws. 7 Cong.Rec. 3849 (Emphasis added).

The policy that military involvement in civilian law enforcement should be carefully restricted has deep roots in American history.[6] Whether there should even be a standing army was a question fiercely debated among the framers of the Constitution. In the congressional debate on the Posse Comitatus Act, several senators expressed the opinion that the Act was no more than an expression of constitutional limitations on the use of the military to enforce civil laws. *See* 7 Cong.Rec. 4240 (remarks of Senator Kernan); 7 Cong. Rec. 4243 (remarks of Senator Marrimon). Recently, Chief Justice Burger, in writing for the Court, addressed the subject of the separation of military and civilian affairs.

The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities—and indeed the claims alleged in the complaint—reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied. Laird v. Tatum, 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2327, 33 L.Ed.2d 154 (1972).

■ In this case, because the Secretary of the Navy Instruction, viewed alone and in the light of the Posse Comitatus Act, affords a non-constitu-

---

5. When a separate Department of the Air Force was created from the Army, Congress provided that statutes, such as the Posse Comitatus Act, continued to apply to the Air Force despite the transfer. *See* National Security Act of 1947, §§ 207(a), 208(a), 305(a), ch. 243, 61 Stat. 502 (1947). Then, in 1956, when Congress revised, codified, and enacted into law Title 10 of the United States Code, the language of the Posse Comitatus Act was restated—though without substantive change—and the words "Air

Force" were included in the text. *See* Act of August 10, 1956, §§ 18(a), 49(a), 53, ch. 1041, 70A Stat. 1, 626, 640, 646 (1956) (10 U.S.C. § 15 repealed and replaced by 18 U. S.C. § 1385).

6. *See* Sparks, National Development 1877–1885, 23 The American Nation, A History 127 (Posse Comitatus Act reflected "the inherited antipathy of the American to the use of troops for civil purposes") cited with approval in Wrynn v. United States, 200 F. Supp. 457, 465 (E.D.N.Y.1961).

tional standard for judging the legality of the military action, we do not find it necessary to interpret relatively unexplored sections of the Constitution [7] in order to determine whether there might be constitutional objection to the use of the military to enforce civilian laws. Nonetheless, our interpretation of the scope and importance of the letter and spirit of the Posse Comitatus Act and the Navy regulation as standards governing primary behavior is influenced by the traditional American insistence on exclusion of the military from civilian law enforcement, which some have suggested is lodged in the Constitution. Thus, interpreting the Secretary of the Navy Instruction within this context, we are reinforced in our conclusion that the Marines in this case violated the Navy's own regulation.

### III.

Our conclusion that the use of Marines in the criminal investigation of defendants violated the Secretary of the Navy's Instruction presents the questions of whether we should reverse the judgments appealed from and whether we should instantly or prospectively create an exclusionary rule for this and future cases as an appropriate remedy for violation of this military regulation.

In the appeals at bar, the evidence of defendant's guilt is overwhelming. While the bulk of the evidence was obtained by violating the Instruction, there is totally lacking any evidence that there was a conscious, deliberate or willful intent on the part of the Marines or the Treasury Department's Special Investigator to violate the Instruction or the spirit of the Posse Comitatus Act. From all that appears, the Special Investigator acted innocently albeit ill-advisedly. The Instruction provides no mechanism for its enforcement [8] and the Act, where it is applicable, renders the transgressor liable to criminal penalties [9] but does *not* provide that "[t]he criminal is to go free because the constable has blundered." People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (Cardozo, J.).

In criminal cases in which the police have violated an accused's Fourth Amendment rights in obtaining evidence of guilt, the result of freeing the guilty has been compelled, either because the "exclusionary rule is an essential ingredient of the Fourth Amendment," Mapp v. Ohio, 367 U.S. 643, 651, 81 S.Ct. 1684, 1689, 6 L.Ed.2d 1081 (1961), or because currently available alternative remedies for Fourth Amendment violations have proved ineffectual. *See, Id.*, 367 U.S. at 652–653, 81 S.Ct. 1684; Bivens v. Six Unknown Fed. Narcotic Agents, 403 U.S. 388, 411, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting); Wolf v. Colorado, 338 U.S. 25, 41, 69 S. Ct. 1359, 93 L.Ed. 1782 (1949) (Murphy, J., dissenting); People v. Cahan, 44 Cal.2d 434, 445, 282 P.2d 905, 911 (1955) (Traynor, J.) ("other remedies have completely failed to secure compliance with the constitutional provisions").

But, putting aside the question of the effectiveness of an exclusionary rule as a deterrent to violations of the Fourth Amendment,[10] we do not find present in

---

7. *See, e. g.* Article I, § 8; Article IV, § 4; Third Amendment.

8. While a violation of lawful general orders or regulations is normally an offense under Article 92 of the Uniform Code of Military Justice and thus cognizable in the courts martial, the military regulation involved here "requires implementation by subordinate commanders to give it effect as a code of conduct" and thus "will not qualify as a general order for the purpose of an Article 92 prosecution." United States v. Scott, 22 U. S.C.M.A. 25, 46 C.M.R. 25, 27 (1972); United States v. Nardell, 21 U.S.C.M.A. 327, 329,

45 C.M.R. 101, 103 (1972). *See* United States v. Woodrum, 29 U.S.C.M.A. 529, 43 C.M.R. 369 (1971); United States v. Tassos, 18 U.S.C.M.A. 12, 39 C.M.R. 12 (1968). Thus, the remedy of naval or marine discipline is probably unavailable. In any event, military regulations could not affect the Treasury Department's Special Investigator who was the one who enlisted the prosecutorial services of the Marines.

9. *See* n. 3, supra.

10. See *Bivens*, supra, 403 U.S. at 411–427, 91 S.Ct. 1999 (Burger, C. J., dissenting);

this case at this time the same considerations which required an exclusionary rule in the Fourth Amendment cases or in other instances where an exclusionary rule has been fashioned and applied. First, the proscription in the Instruction against the use of Marines in ordinary civilian criminal law enforcement was until today far less clear and far less widely known than the prohibition of the Fourth Amendment against unreasonable searches or the rules of court requiring an accused to be produced before a magistrate within a designated period after apprehension. *See* McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Secondly, the Instruction expresses a policy that is for the benefit of the people as a whole, but not one that may fairly be characterized as expressly designed to protect the personal rights of defendants.[11] *Cf.* United States v. Heffner, supra. Thirdly, the facts that the Instruction provides no mechanism for its own enforcement— and especially no criminal sanction for its violation—and that its legal effect was far from obvious, means that admission of the evidence of guilt does not require the court to condone "dirty business." *See* McNabb v. United States, supra, 318 U.S. at 345–346, 63 S.Ct. 608; Eleuteri v. Richman, 26 N.J. 506, 512, 141 A.2d 46, 49 (1958) (Weintraub, C.

J.); People v. Cahan, 44 Cal.2d 434, 445–456, 282 P.2d 905 (1955) (Traynor, J.).

More important than any of the foregoing is the fact that this case is the first instance to our knowledge in which military personnel have been used as the principal investigators of civilian crimes in violation of the Instruction. We are not aware from the reported decisions of other courts that there has been any other violation, let alone widespread or repeated violations.[12]

Even though we sustain defendants' convictions, we have no reason to fear that others will be sought or obtained in violation of the Instruction now that we have expressed our view of its scope and effect. Nor is there reason to doubt that the military, now that we have declared the effect of the Instruction, will fail to take steps to provide a mechanism to enforce it.

For all of these reasons, we therefore decline to reverse defendants' convictions or to impose the extraordinary remedy of an exclusionary rule *at this time*. Should there be evidence of widespread or repeated violations in any future case, or ineffectiveness of enforcement by the military, we will consider ourselves free to consider whether adoption of an exclusionary rule is required as a future deterrent.

Affirmed.

---

Oakes, Studying the Exclusionary Rule in Search and Seizure, 37 U. of Chi.L.Rev. 665 (1970).

11. In this connection, it should be remembered that Congress has the express power "[t]o provide for calling forth the Militia to execute the laws of the Union, suppress Insurrections, and repel Invasions . . . ," Const. Art. I, § 8, as well as the obligation to "guarantee to every State . . . a Republican Form of Government . . . [to] protect each . . . against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence," Const. Art. IV, § 4. Congress has responded by the enactment of 10 U.S.C. § 331:

Whenever there is an insurrection in any State against its government, the Presi-

dent may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal Service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection.

Thus, the Constitution recognizes that in certain circumstances, military preservation and enforcement of civilian law is appropriate; the policy consideration underlying the Posse Comitatus Act is not absolute.

12. *Cf.* Burns v. State, 473 S.W.2d 19 (Tex. Cr.App.1971) (no violation of Posse Comitatus Act).