**John JACKSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 2721.**

Supreme Court of Alaska.

Dec. 2, 1977.

John M. Murtagh, Barbara J. Miracle, Chris J. Rigos, Asst. Public Defenders, and Brian Shoretell, Public Defender, Anchorage, for appellant.

Geoffrey G. Currall, Dist. Atty., Ketchikan, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Ronald S. Matthew, Asst. Legal Officer, J. B. Ellis, II, District Legal Officer, Seventeenth Coast Guard Dist., Juneau, and G. Kent Edwards, U. S. Atty., Anchorage, for amicus United States.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

RABINOWITZ, Justice.

This appeal presents the first impression question whether the Posse Comitatus Act [1] applies to the United States Coast Guard.

John Jackson was indicted, by secret indictment, for the sale of cocaine to George Tellmann.[2] At the time of his arrest, Jackson was in possession of another narcotic and was subsequently indicted for that possession. Jackson then filed a motion to dismiss or suppress based, in part, on asserted violations of the Posse Comitatus Act. After an extensive evidentiary hearing, the superior court denied Jackson's motion to dismiss or suppress. Jackson then withdrew his previously entered pleas of not guilty and entered pleas of nolo contendere to the possession and sale charges reserving his right to appeal from the denial of the motion to suppress or dismiss.[3] This appeal followed.

The facts leading up to Jackson's apprehension and conviction are as follows. George Tellmann, the informant involved in this case, was at all relevant times a corpsman in the United States Coast Guard stationed on Annette Island in southeastern Alaska. In October 1973, Tellmann and other guardsmen on the Annette base were investigated by Coast Guard Intelligence for drug violations. During Tellmann's interview by Coast Guard Intelligence agent Steven Jimmerfield, he was asked for information on drug activities. He did not give the agent any information at that time. Tellmann ultimately was given a captain's mast on the charge and received a $75 fine.

In early November, Tellmann began calling Jimmerfield and revealing the names of people in Metlakatla and Ketchikan who were supposedly involved with illicit drugs. Since Tellmann was due for a transfer, Jimmerfield thought they would "need to have [Tellmann] prove himself" with respect to the validity of his information. Jimmerfield was in regular contact with the Alaska State Troopers, exchanging information on drug activities. Jimmerfield talked to the troopers about Tellmann.[4]

---

1. 18 U.S.C. § 1385 (1970). The Posse Comitatus Act reads:

    Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, wilfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

    We have not found any reported decisions which address the issue raised in this case and none have been cited by the parties. Of the few reported decisions under the Posse Comitatus Act, most treat violations of the Act by the Army and Air Force or concern the non-extraterritorial effect of the Act. *United States v. Jaramillo*, 380 F.Supp. 1375 (D.Neb.1974), *aff'd*, 510 F.2d 808 (8th Cir. 1975); *United States v. Banks*, 383 F.Supp. 368 (D.S.D.1974); *United States v. Red Feather*, 392 F.Supp. 916 (D.S.D. 1975); *Wrynn v. United States*, 200 F.Supp. 457 (E.D.N.Y.1961); *Chandler v. United States*, 171 F.2d 921 (1st Cir. 1948).

2. Sale of cocaine is a violation of AS 17.10.010. Cocaine is included within the scope of AS 17.10.010 by AS 17.10.230(10) and (13).

3. In *Cooksey v. State*, 524 P.2d 1251, 1255–57 (Alaska 1974), we allowed the appellant to preserve a point on appeal by entering a plea expressly conditioned upon a limited right of appeal.

4. The following exchange between the court and Jimmerfield is in the record:

    Q: Now, when did you first talk to the troopers? You say that was some time during this period you talked to the troopers about . . . .

    A: Yes, it was.

    Q: . . . . Tellmann going to work as an informant?

    A: I told them that I was receiving information from an informant. I asked them if they were interested in the information that we were receiving. They said yes. They asked me if he would work with the state.

Tellmann was asked by Jimmerfield, on behalf of the troopers, if he would work with the state.

Tellmann began his undercover work in early January 1974. He was briefed by Jimmerfield and two troopers on how to avoid entrapment in making the drug buys. Throughout the month of January when Tellmann worked with the troopers making drug buys, Jimmerfield supervised Tellmann and took an active role in the investigation. This was so even though the investigation was not directed toward military persons. When the troopers thought that it would be helpful for Tellmann to remain in the Ketchikan area past the expiration of his regular liberty, Jimmerfield contacted Tellmann's executive officer to obtain "special liberty" for Tellmann. All money for drug purchases and Tellmann's undercover expenses were furnished by the Alaska State Troopers. The troopers also paid for Jimmerfield's hotel bill on one occasion.

We now turn to the question whether the United States Coast Guard is within the ambit of the Posse Comitatus Act. The Act, in its present form, reads:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.[5]

Jackson grounded his motion to suppress primarily on the thesis that the actions of Jimmerfield and Tellmann violated the Posse Comitatus Act,[6] that the Act applies to the United States Coast Guard,[7] and that all evidence relating to the two offenses which are the subject of this appeal should be suppressed under Alaska Criminal Rule 26(g) which provides: "Evidence illegally obtained shall be used for any purpose including the impeachment of a witness."

■ Since we are called upon to interpret the Posse Comitatus Act to determine whether it is applicable to the United States Coast Guard, we consider it appropriate to discuss the historical context in which the Posse Comitatus Act was enact-

---

5. 18 U.S.C. § 1385 (1970).

6. The superior court concluded that Tellmann's activities were completely voluntary and based on his own initiative rather than in response to requests from civilian law enforcement officials. In this regard, the superior court said:
   > In any event, in this case I find that Tellmann's involvement was voluntary. It took place on his off duty hours. I find that he was under no compulsion to do it, either from the state police or the Coast Guard in conjunction with the state police and that his use . . . under these circumstances does not violate the Act. I do not read that Act as holding that the use of military personnel of any branch on their off duty hours in this kind of endeavor would violate that Act.

7. The superior court assumed that the United States Coast Guard was governed by the Posse Comitatus Act. In regard to the scope of the Posse Comitatus Act, the superior court stated:
   > There may well not be any other area in federal criminal law in which you can find only 5 reported cases . . . . . Beginning with the premise that that Act, as I read it, requires some affirmative act on the part of the—either the military agency involved and I'll state that I've assumed . . . that the Coast Guard is in fact a branch of the military service in this country and I'm assuming without—again without deciding that the Act itself is meant to apply to the military establishment and not just the Army and the Air Force and I reach that conclusion from comments in *Walden* and also in the Navy regulations in which the term comments regarding the federal policy. I think our constitutional history demonstrates a fear, a distrust, a dislike of having the military involved in civilian activity. And it's plain to me at least that the reach of that Act goes to the military establishment and not just the named services. I'm assuming that the Coast Guard falls into that.

ed. The Posse Comitatus [8] Act [9] was passed in 1878, a product of the Civil War Reconstruction Era. The United States Army had been actively employed to maintain order in the South, and allegedly, had been used to stabilize the Republican governments of carpetbaggers and scalawags.[10] According to one commentator, "[t]he pivotal issue became the free use of the federal troops as a *posse comitatus* in the aid of civilian officials to execute the laws." [11]

The bill was introduced as an amendment to the Army Appropriations Bill.[12] At one point the proposed draft referred to the "land and naval forces of the United States," but this language was not finally adopted.[13]

The Posse Comitatus Act has remained virtually unchanged in the years since its passage. In 1956 when the Act was codified, the Air Force, as a housekeeping measure, was added by name to comport with

8. "Posse Comitatus" is defined as:
> The power or force of the county. The entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases; as to aid him in keeping the peace, in pursuing and arresting felons, etc.

Black's Law Dictionary 1324 (4th ed. 1951). According to one authority:
> The *posse comitatus* derives its name from the entourage or retainers which accompanied early Rome's proconsuls to their places of duty and from the *comte* or *counte* courts of England. It was a summons to every male in the country, over the age of fifteen, to be ready and appareled, to come to the aid of the sheriff for the purpose of preserving the public peace or for the pursuit of felons.
> In the United States, a sheriff may call on the posse for aid and those persons called are required to assist or be punished. Those states having statutes delineating the use of the *posse comitatus* have merely affirmed the common law. (footnotes omitted)

Furman, *Restrictions Upon Use of the Army Imposed by the Posse Comitatus Act*, 7 Military L.Rev. 85, 87 (1960).

9. No one has ever been prosecuted for violating the Act. Note, *The Posse Comitatus Act: Reconstruction Politics Reconsidered*, 13 Amer. Crim.L.Rev. 703 (1976).

10. 'For twelve years some of the Southern States have not known self-government or constitutional freedom. And the Army has been used as the main instrument to effect their overthrow and uphold this despotism.' *Id.* at 705 n.16, *quoting* 5 Cong. Rec. 2114 (1877) (remarks of Congressman Atkins, a sponsor of the bill).

Concerning the events preceding the passage of the Posse Comitatus Act, another commentator makes the following observations:
> The excessive use of federal machinery under the Federal Election Laws in the presidential election of 1876 by the Republican administration, and the policy of President Grant in furnishing federal troops to preserve the peace in some of the Southern States where the two political elements almost came to a death-grapple in their struggle for

votes, aroused the protest of the Democrats in Congress. The opposition became more intense when the results of that election, apparently in doubt for several months, [were] finally decided in favor of Mr. Hayes, the Republican candidate.
> The Democratic majority in the House opened war in 1876 on the Federal Election Laws by trying to put a rider on the appropriations for the support of the army, but it was defeated by the Republican majority in the Senate. The matter was again warmly debated in the closing session of the Forty-fourth Congress and resulted in a failure of Congress to enact the annual appropriation for the support of the Army for the ensuing year. Various bills were introduced in the next Congress looking toward a limitation of the powers of the Executive. A 'rider' was again attached to the annual appropriation bill. The Democrats were persistent; the Republican Senate and President Hayes were obliged to yield to save the army. The long debate culminated in the enactment of a 'rider' on the Army Appropriation Act of June 18, 1878, reading as follows:
> From and after the passage of this act it shall not be lawful to employ any part of the Army of the United States, as a *posse comitatus*, or otherwise, for the purpose of executing the laws, except in such cases and under such circumstances as such employment of said force may be expressly authorized by the Constitution or by act of Congress; any person willfully violating the provisions of this section shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by fine not exceeding $10,000 or imprisonment not exceeding two years or both such fine and imprisonment.

Lorence, *The Constitutionality of the Posse Comitatus Act*, 8 U. Kansas City L.Rev. 164, 165 (1940).

11. *Reconstruction Politics, supra* note 9, at 706 (footnote omitted).

12. *Id.* at 709.

13. *Id.* at 709–10 & n. 37.

the separation of the Air Force from the Army in 1947.[14] In 1975, there was an attempt to amend the Act by substituting the words "Armed Forces of the United States" for "Army and Air Force," but the amendment died in committee.[15]

■ Jackson argues that even though by its terms the Act applies only to the Army and Air Force, this court should recognize that "the policies behind the Act, and the potential for abuse by any branch of the military" require application of the Act to the case at bar. The state, on the other hand, contends that had Congress wanted to extend coverage of the Act to the Coast Guard, it could have done so.[16] The Coast Guard, appearing as amicus, argues that the terms of the Act and the history of the function of the Coast Guard as a federal law enforcement agency illustrate the Act's inapplicability to it.

■ The sole case in which the courts have addressed the issue of the application of the Posse Comitatus Act to branches of the armed forces other than the Army or Air Force is *United States v. Walden*, 490 F.2d 372 (4th Cir.), *cert. denied*, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974). In *Walden*, the defendants, civilians, had been convicted of federal firearms violations. The bulk of the evidence used against them was the product of an undercover investigation carried out in large part by several Marines at the request of a Spe-cial Investigator of the Alcohol, Tobacco and Firearms Division of the U. S. Treasury Department. The Navy is not included by the terms of the Posse Comitatus Act, however by regulations the Act had been adopted by the Navy. The Fourth Circuit held:

> We do not think that the letter of the Act was violated. We conclude, however, that there was a violation of the regulations; but, because this case presents the first instance of which we are aware in which illegal use of military personnel in this manner has been drawn into question, we decline to impose the extraordinary remedy of an exclusionary rule at this time or to reverse the judgments. We reserve, however, the possibility that such a rule may be called for should repeated cases involving military enforcement of civilian laws demonstrate the need for the special sanction of a judicial deterrent. We affirm the judgments entered on the convictions.[17]

In reaching that conclusion, the *Walden* court, noting that the Navy regulation did not contravene any congressional purpose in excluding the Navy and Marines, stated:

> Thus, the failure to include the Navy in the text of the Act cannot be read as congressional approval of the use of Navy personnel to enforce civilian laws.
>
> Indeed, consideration of the legislative history of the Act and interpretative opinions reveals a policy applicable to all of the armed services. . . .

**14.** Pub.L. 84–1028, 70A Stat. 626 (1956).

The Alaska Omnibus Act eliminated provisions which had made the Posse Comitatus Act inapplicable to Alaska. Pub.L. 86–70, 73 Stat. 144 (1959).

**15.** The Omnibus Crime Act, S. 1, proposed the following version of the Act:

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, knowingly uses any part of the Army, Navy, or Air Force as a posse comitatus or otherwise to execute the laws is guilty of a Class A misdemeanor. Nothing in this section shall be construed to affect the law enforcement functions of the United States Coast Guard.

S. 1, 94th Cong., 1st Sess., Tit. II, pt. G., *quoted in Reconstruction Politics, supra* note 9, at 711 n. 43.

**16.** The state also advances the argument that the basic axiom of statutory construction which requires that criminal statutes be construed narrowly mandates an interpretation excluding the Coast Guard from the reach of the Posse Comitatus Act. We do not find this argument appropriate in the context of this case. The doctrine that penal statutes are to be construed strictly is founded on the public policy of protecting the interests of those against whom penalties are sought to be enforced. It is a product of the principle of fundamental fairness that dictates that the government make unmistakably clear to the individual exactly what conduct is proscribed. However, we are not concerned with the prosecution of an individual for violation of the Posse Comitatus Act, but, rather, with the protection of a third party's rights.

**17.** 490 F.2d at 373.

The policy that military involvement in civilian law enforcement should be carefully restricted has deep roots in American history. Whether there should even be a standing army was a question fiercely debated among the framers of the Constitution. In the congressional debate on the Posse Comitatus Act, several senators expressed the opinion that the Act was no more than an expression of constitutional limitations on the use of the military to enforce civil laws.[18] (footnotes omitted).

Despite this language in *Walden* pertaining to the limitation of military involvement in the enforcement of civil laws, the existence of the regulation is a fact which strongly distinguishes that case from the case at bar.

The United States Coast Guard would have us distinguish the *Walden* case on the grounds that the Fourth Circuit did not consider the problem of a unique, hybrid agency such as the Coast Guard with its military organization and specific statutory law enforcement authority. There is also merit in the Coast Guard's further argument that:

In determining that the Navy had violated its own administrative adoption of the Act, the [*Walden*] court noted that the Navy's administrative extension of the Act did not contravene any congressional purpose to exclude the Navy and Marines from the Act. In the case of the Coast Guard, however, congressional intent that the Coast Guard be excluded from the Act is apparent, as indicated by the Coast Guard's statutory law enforcement function. (footnote omitted).

In its helpful amicus brief, the Coast Guard has alluded to historical and statutory factors which set it apart from the other branches of the armed forces. The following historical outline of the United States Coast Guard is found in the amicus brief:

The earliest beginnings of the Coast Guard coincide with the initial formation of the Federal Government following the ratification of the Constitution. In 1790, as a result of increased smuggling activities which were causing a serious loss of revenue, to the new nation, Congress authorized the construction of ten 'revenue cutters' for the specific purpose of controlling smuggling along the coast. The 'Revenue Cutter Service' or 'Revenue Marine,' as it was variously called was administered by the Treasury Department where it remained, even after it became the Coast Guard, until 1967 when it was transferred with all its duties and functions to the Department of Transportation. In its early years, the Revenue Marine established itself as the primary agency enforcing laws against smuggling, piracy and the slavetrade. The organization officially called the Coast Guard came into being in 1915 upon the consolidation of the Revenue Cutter Service and the Lifesaving Service. Since that time, additional duties have continually been added to those the Coast Guard has been required to perform. One of the activities for which the Coast Guard is perhaps best known was its patrol against rumrunners during prohibition. The Lighthouse Service was transferred to the Coast Guard in 1939 and the Bureau of Marine Inspection and Navigation was transferred in the early forties. The Coast Guard was constituted as a military service and a branch of the Armed Forces of the United States in 1941. Finally, in 1949, the duties and functions of the Coast Guard were clearly set down and codified in Title 14. (footnotes omitted)

Concerning the statutory factors which the Coast Guard asserts set it apart from the other branches of the armed forces, the Coast Guard argues that it is, by law, "an organization with a unique dual role." Although 14 U.S.C.A. § 1 (1977 Supp.) establishes the Coast Guard as a military service and a branch of the armed forces of the United States, the same statute designates it as a service in the Department of Transportation except when operating as a ser-

18. 490 F.2d at 375.

vice in the Navy.[19] One of the enumerated primary duties of the Coast Guard is to "enforce or assist in the enforcement of all applicable Federal laws on and under the high seas and waters subject to the jurisdiction of the United States."[20] The Coast Guard is also charged with the duty of administering laws with respect to the safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States.[21] Other duties include developing, establishing, maintaining and operating various water related services and facilities.[22] We think it also of significance that the Coast Guard is authorized by the provisions of 14 U.S.C. § 141(a) (1970) as follows:

> The Coast Guard may, when so requested by proper authority, utilize its personnel and facilities to assist any Federal agency, State, Territory, possession, or political subdivision thereof, or the District of Columbia, to perform any activity for which such personnel and facilities are especially qualified.

On the basis of the foregoing, we have concluded that the Posse Comitatus Act was not intended to cover the United States Coast Guard. First, we think a reading of the text leads to the conclusion that the Posse Comitatus Act applies only to the Army and the Air Force. Second, the legislative history of the Act indicates that Congress intended to limit the coverage of the Act to the Army and the Air Force. The fact that Congress avoided explicitly including the naval forces or the Coast Guard when the Posse Comitatus Act was passed and in the proposed 1974 amendment which died in committee weighs heavily in our conclusion that the Coast Guard is not within the ambit of the Act.[23] Similarly, the law enforcement role established for the Coast Guard by Congress indicates that Congress did not intend to make the Posse Comitatus Act applicable to the United States Coast Guard. Given the unique dual organizational character of the Coast Guard and the various specific statutory mandates requiring it to enforce certain laws and regulations,[24] we conclude that it would be inappropriate to construe the Posse Comitatus Act as applying to the United States Coast Guard.[25]

We therefore hold that the superior court's denial of Jackson's motion to suppress or dismiss should be affirmed.

MATTHEWS, J., not participating.

---

**19.** The Department of Transportation Act transferred the Coast Guard, in its entirety, to the Department of Transportation Pub.L. 89–670, § 6(b)(1), 80 Stat. 931 (1966).

In time of war or when the President directs, the Coast Guard operates as a service in the Navy. 14 U.S.C.A. § 3 (1977 Supp.). The Coast Guard is not part of the Department of Defense. 10 U.S.C. § 101 (1970).

**20.** 14 U.S.C.A. § 2 (1977 Supp.).

**21.** *Id.*

**22.** *Id.*

**23.** The United States Coast Guard, in its amicus brief, relates the following segment of the Act's history:

> In 1974, during an attempt in the 94th Congress to amend the Posse Comitatus Act by changing 'Army and Air Force' to 'Armed Forces of the United States,' the Department of Justice responded to a request from the Senate Judiciary Committee for comments on the proposal. In its letter, the Department of Justice stated that it was opposed to the amendment of the Act. One of the reasons for this opposition was that it would 'prohibit the Coast Guard from carrying out its historical law-enforcement duties.' The letter of opposition continued by suggesting that the Coast Guard be expressly excluded from the Posse Comitatus Act. The proposal was never reported out of committee. (footnote omitted)

**24.** In addition to the statutes previously cited, see 14 U.S.C. § 89(a) and (b) (1970) as well as the statutes collected in note 30 of the amicus brief.

**25.** We do not believe the enforcement measures in the case at bar were within the scope of 14 U.S.C. § 141(a) (1970), quoted *supra*, because Coast Guard personnel are not "especially qualified" to serve as undercover drug informants. The question whether such activities are proper for the Coast Guard is not before us on this appeal, and we expressly do not reach the issue. Our opinion is limited to a determination that such efforts are not prohibited by the Posse Comitatus Act.