[Crim. No. 4707. Fifth Dist. June 30, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK ANDREW BLEND, Defendant and Appellant.

COUNSEL

J. Ethan Faust, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Ramon M. de la Guardia and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HANSON (P. D.) J.—Appellant was convicted of two counts of selling cocaine (Health & Saf. Code, § 11352) and was placed on felony probation for five years with service of nine months in the county jail and payment of a $500 fine imposed as conditions of probation. The main argument presented by appellant is that evidence of the sales of cocaine should be suppressed because information leading to the circumstances of the sales was obtained in violation of the Posse Comitatus Act (18 U.S.C. § 1385) which makes the willful use of the military in executing civil laws a criminal offense.

At the preliminary hearing, Investigator Walter J. Osborne of the Kings County Sheriff's Department Narcotics Task Force testified that he purchased a vial of white powder, later found to be cocaine, from appellant in the bowling alley parking lot at Lemoore Naval Air Station on December 12, 1978, paying appellant five $20 bills. The transaction was tape recorded. Appellant was in the service and Osborne was aware of it. The following day, December 13, Osborne made a second purchase of cocaine from appellant at the same location; this transaction was also tape recorded. At the December 12 buy, Osborne was accompanied by a "female operator," Dylan Gray, a Wave stationed at Lemoore, who introduced Osborne to appellant. She previously had been arrested by Osborne for a narcotic violation occurring in the Hanford area, and a felony complaint was filed against her in Hanford Justice Court. She was told by Osborne that if she cooperated by introducing him to two people from whom Osborne might purchase drugs, her case would be dismissed. Gray made two introductions, and ultimately the charge against her was dismissed.

Defense counsel inquired whether the narcotic task force was working in cooperation with the Navy in the transactions with appellant. Osborne stated that the case was handled solely by the narcotic task force, that the Naval Investigative Service (NIS) was informed of the investigation, and NIS officers secured one-trip passes for Osborne to come on

base on each occasion. Osborne explained that narcotic cases investigated by the narcotic task force involving Navy personnel were generally processed through the civilian courts unless the violations were minor, in which case the matter was processed by the NIS. Major cases were handled by the narcotic task force, although information was given to the NIS. The sale of cocaine was regarded by Osborne as a major offense. Officer Russell Curry, on special assignment to the Kings County Narcotics Task Force, and Investigator Jones went to appellant's room on the Navy base with a warrant for his arrest. Appellant was not in his room; Curry and Jones were admitted by appellant's roommate and waited until appellant was brought from his workstation by NIS agents, then Curry arrested appellant.

During the hearing on appellant's pretrial motion to exclude evidence and to dismiss the information, the defense called Steve H. Ozawa, attorney for the United States Navy Judge Advocate General Court at Lemoore Naval Air Station, who testified that sale of cocaine is an offense under the Uniform Code of Military Justice which might be referred to either a special or general court martial, and that the commanding officer, just as a district attorney, has discretion in charging. Ozawa stated it had been the practice to refer serious cases of assault or homicide to the local district attorney, but, for the most part, drug offenses were handled by the military. Defense counsel argued that the evidence of sales by appellant to Osborne should be suppressed because the participation of Dylan Gray, an active duty Wave, was in violation of the Posse Comitatus Act. The trial court denied appellant's motion to exclude evidence, specifically finding that no violation of the Posse Comitatus Act had been shown and stated: "The Court has read Red Feather [*United States* v. *Red Feather* (D.S.D. 1975) 392 F.Supp. 916], and it seems to me that Red Feather distinguishes between what it calls direct and active use of the federal troops to execute the law, and then they cite certain proscribed conduct, such as search and seizure, arrest, and these kinds of things, which is not permitted under the Posse Comitatus Act, but then they do go on and say that there also can be a certain course of conduct, which is what they refer to as passive involvement, and it says, 'Such passive involvement of federal military troops which might indirectly aid civilian law enforcement is not made unlawful under 18 U.S.C. 1385.' The conduct, as I see it here of one enlisted W.A.V.E. introducing local officers to the defendant doesn't allow them to do anything more than passive action on the part of the military, so therefore I feel that it doesn't—isn't involved, and I

would not accept the propositions that this prosecution must terminate because of that."

The evidence presented at trial established without contradiction the two sales of cocaine by appellant to Investigator Osborne; Gray participated only in the first sale. Osborne testified at trial that Gray was cooperating with the Kings County Narcotics Task Force in return for a promise to recommend dismissal of a felony charge pending against her. She had been arrested for a sale in lieu of a controlled substance. In accordance with the arrangement, Gray telephoned appellant at his barracks at Lemoore Naval Air Station on December 12, 1978, to confirm a meeting with herself and Osborne for the purpose of purchasing cocaine. The telephone call was made from the narcotic task force office and was monitored and tape recorded with Gray's knowledge and consent. The recording of this conversation was introduced at trial and played for the jury.

Following the telephone call, Osborne drove with Gray to the naval air station and met appellant at the parking lot of a bowling alley. Gray introduced Osborne to appellant as "Tony"; Osborne stated that he wanted to purchase a sample gram of cocaine, and was seeking larger amounts. Appellant gave Osborne a vial of powder which subsequently was found to be .89 grams of cocaine, a usable quantity; Osborne paid appellant $100 (five $20 bills) in recorded money.

This transaction was recorded by means of a one-way radio transmitter concealed on Osborne's person. The conversation was monitored and recorded by Officer Calhoun who was parked nearby in an unmarked vehicle. The tape of this transaction was introduced in evidence and played for the jury.

The next day, December 13, 1978, Osborne telephoned appellant and arranged to meet at the same location to purchase more cocaine. This conversation was recorded, and was introduced at trial. Osborne met appellant at approximately 5 p.m. as arranged. Appellant sold Osborne a second vial containing a usable amount of cocaine (.90 grams) for $100. This transaction was recorded in the same manner as that of the preceding day, and the tape was introduced at trial.

Osborne testified that it was a standard procedure to offer persons arrested for narcotic offenses the opportunity to cooperate with the task force in making purchases in exchange for recommendations to the dis-

trict attorney. The nature of the recommendation depended upon the severity of the charge and the extent of the arrestee's assistance. Osborne stated that appellant was offered such an arrangement in accordance with usual procedures.

The defense theory was entrapment. Appellant did not testify. Dylan Gray was stationed in Hawaii at the time of trial; she testified that in December 1978 she was stationed at Lemoore Naval Air Station and that she had checked out of Lemoore on November 29 or 30 to go to Hawaii. On December 11, 1978, she went to appellant's barracks and arranged to meet appellant the next day and introduce him to her "friend" for a buy. Gray referred to Osborne as "Tony." On December 12, she telephoned appellant and discussed her meeting him; she understood that the phone call was to be recorded. She introduced Osborne to appellant at the bowling alley parking lot on the base, but took no further part in the buy. Although she stated that she did not approve of her participation, she said that she was acting voluntarily on December 12. After the purchase, Osborne drove Gray to her house to pick up her belongings, then to the bus depot. Gray visited her parents and went to Hawaii.

No California case has discussed the application of the statute, 18 United States Code section 1385, known as the Posse Comitatus Act,[1] which is the basis of appellant's exclusion motion; the act provides: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both." The statute, originally enacted in 1878, applies to all branches of the federal military. (*United States* v. *Walden* (4th Cir. 1974) 490 F.2d 372, 375, cert. den. 416 U.S. 983 [40 L.Ed.2d 760, 94 S.Ct. 2385]; Meeks, *Illegal Law Enforcement: Aiding Civil Authorities in Violation of the Posse Comitatus Act* (1975) 70 Mil. L.Rev. 83, 100-103 (hereafter cited as Meeks).

Within the last decade, the act has been raised in a variety of factual situations by criminal defendants seeking to exclude evidence allegedly

---

[1]Posse comitatus is "[t]he power or force of the county. The entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, . . ." (Black's Law Dict. (5th ed. 1979) p. 1046.)

obtained by violation of the statute. Few cases have found violations; of these, one is a civil matter (*Wrynn* v. *United States* (E.D.N.Y. 1961) 200 F.Supp. 457). No case has been found in which the court actually excluded evidence on the violation ground. No authority has been found indicating that a prosecution was pursued under 18 United States Code section 1385 for a violation of the act.

The cases from other jurisdictions, federal and state, interpreting the act do not agree on the type of involvement of military personnel in civilian law enforcement required to constitute a violation of the statute. The origins of the act are dramatic and extend historically to the Boston Massacre in 1770, and the Boston Tea Party in 1773. The Judiciary Act of 1789 contained the first posse comitatus legislation in the United States. (Meeks, *supra*, p. 88.) The Posse Comitatus Act followed abuses in the use of federal troops to enforce the laws in the southern states after the Civil War; "[t]he policy that military involvement in civilian law enforcement should be carefully restricted has deep roots in American history," and arguably has constitutional underpinnings.[2] (*United States* v. *Walden, supra*, 490 F.2d 372, 375-376; Meeks, *supra*.)

*People* v. *Burden* (1981) 411 Mich. 56 [303 N.W.2d 444, 446-447], which cites in part a dissenting opinion of Presiding Justice Walsh of the Michigan Court of Appeals,[3] contains an enlightening background of the statute:

"'With the end of armed hostility between the North and South came a period of political domination by Northerners of their fellow citizens in the South. Large numbers of Federal troops were extensively used in the South to enforce the law and to support the new carpetbag government. The reconstruction act of 1867 implemented Congressional belief that military rule was necessary in the southern states. It was the "outrageous meddling" of Federal troops in the 1876 presidential elections in the South which precipitated the proposal and passage of the act.' 94 Mich.App. 218-219, 288 N.W.2d 392 (1979).

"Examination of the Senate debate on the enactment is illuminating. The proponents were seeking to overrule an Attorney General's opinion

---

[2]No party is pursuing a constitutional argument in this appeal.
[3]*People* v. *Burden* (1979) 94 Mich.App. 209 [288 N.W.2d 392], wherein the dissent was filed, was reversed in *People* v. *Burden, supra*, 411 Mich. 56.

on which these post-Civil-War actions had been based.[3] Senator Merrimon of North Carolina said:

"'The people are interested in the law; it is their law; it is their duty to execute it, and the Army, their Army—for it is their Army at last—is only to be used in extreme cases and in the last resort. ...

"'Now, sir, we know by sad experience that the Army has been used not once, but time and time again, in a way that not a court in this nation would sanction. The Army has not only been used in the collection of the internal revenue in a way not authorized by law, but it has been used and prostituted to control elections repeatedly. ... The object of this section is to prevent a like prostitution of the Army in the future.'[4]

"Senator Windom asked if the act would prevent a soldier from coming to the defense of one who is being murderously assaulted; Senator Merrimon responded:

"'If a soldier sees a man assaulting me with a view to take my life, he is not going to stand by and see him do it; he comes to my relief not as a soldier, but as a human being, a man with a soul in his body, and as a citizen.'[5]

"But, said Senator Merrimon, 'If there had been a thousand soldiers there they could not have interposed as soldiers' and '[a] general ... could not have commanded' them to act. Similarly, Senator Hill of Georgia said:

"'Of course, there are occasions in all countries where under the laws it is the duty of every man to save life, to save property, to suppress crime. ... But that is not the question involved here. The question is not involved in this section whether soldiers would be guilty of crime when they would suppress a crime like any other citizen would suppress it. The point is in their character as an army.'[6]

---

"[3]Attorney General Caleb Cushing had said that the posse comitatus included every person over the age of 15, whatever his occupation, 'including the military of all denominations, militia, soldiers, marines, all of whom are alike bound to obey the commands of a [civilian] sheriff or marshal.' 6 Opinions of the Attorneys General of the United States 466, 473 (May 27, 1854)."

"[4]7 Congressional Record 4245 (1878)."

"[5]*Id.*"

"[6]*Id.*, 4247."

Appellant contends that three separate bases exist for the alleged violations of the Posse Comitatus Act involving personnel at the Lemoore Naval Air Station: the activity of Gray in setting up the buy, the cooperation of NIS in permitting the investigation to proceed on base and in providing Osborne with passes, and the assistance of the NIS in appellant's arrest.[4]

■ The trial court ruled that there was no violation of the Posse Comitatus Act because the participation of Dylan Gray in the criminal investigation was "passive," relying on language in *United States* v. *Red Feather* (D.S.D. 1975) 392 F.Supp. 916, 923-925. While we have some difficulty with the passive/active reasoning, we agree that there was no violation of the statute.[5]

*Red Feather* is one of several cases which address the application of the Posse Comitatus Act to military involvement in law enforcement activities during the 1973 Wounded Knee uprising. See also *United States* v. *McArthur* (D.N.D. 1976) 419 F.Supp. 186, 194; affd. (8th Cir. 1976) 541 F.2d 1275, cert. den. 430 U.S. 970 [52 L.Ed.2d 362, 97 S.Ct. 1654]; *United States* v. *Jaramillo* (D.Neb. 1974) 380 F.Supp. 1375, app. dism. (8th Cir. 1975) 510 F.2d 808 [30 A.L.R.Fed. 647]; *United States* v. *Banks* (D.S.D. 1974) 383 F.Supp. 368, app. dism. (8th Cir. 1975) 513 F.2d 1329.) The evidence in the Wounded Knee cases shows that the Department of Defense sent an army colonel to the scene to observe the disorder; eventually the officer became involved as an advisor to the civilian law enforcement authorities on logistics and tactics. The Wounded Knee cases concern factual situations vastly different from that presented here, are easily distinguishable, and provide little assistance in analyzing appellant's claim.

Appellant cites *United States* v. *Walden, supra,* 490 F.2d 372, and *State* v. *Danko* (1976) 219 Kan. 490 [548 P.2d 819], as supporting his

---

[4]Appellant's third ground, although not argued specifically at the pretrial hearing on appellant's motion to exclude evidence, is preserved for purposes of appeal by appellant's reference to the activities of the NIS in his written motion. The parties and the court treated the motion to exclude evidence as a common law motion and appellant renewed his objection near the close of the trial, referring to the pretrial motion and to the evidence presented at the preliminary hearing; however, because no evidence against appellant, subject of the motion to suppress, was obtained through or during the arresting process, this contention is of no aid to appellant.

[5]Meeks terms the "passive-active" distinction made in *Red Feather* untenable (see Meeks, *supra,* at pp. 122-123).

argument that a violation of the Posse Comitatus Act occurred through use of Gray as an informant.

In *United States* v. *Walden, supra,* a Virginia couple was convicted of violating the federal firearms law's prohibition of sales to minors and nonresidents established through the testimony of three enlisted marines and a Treasury agent acting as undercover agents. The opinion of the Fourth Circuit states that, at the request of a special investigator of the Alcohol, Tobacco and Firearms Division of the United States Treasury Department, the marines posed as ordinary purchasers while obtaining evidence of the defendants' illegal activities. (490 F.2d at p. 373.) The court found that this activity violated the Secretary of the Navy's instruction which adopted the policy of the Posse Comitatus Act, but did not require exclusion of evidence. After publication of the opinion, a new directive was issued by the Secretary of the Navy explicity forbidding navy and marine personnel from enforcing the civilian law in violation of the Posse Comitatus Act. (See Meeks, *supra,* at p. 103.)

The Supreme Court of Kansas concluded in *State* v. *Danko, supra,* 548 P.2d 819, that a "technical violation" of the act had occurred where a military policeman participated in an auto search at the request of a civilian law enforcement officer while on joint patrol in the Town of Junction City, adjacent to Fort Riley, a military base. Relying heavily on the *Walden* case, the court found that exclusion of the evidence seized during the search was inappropriate. (*Id.,* at pp. 823-825.)

These two cases clearly are distinguishable on their facts. In *State* v. *Danko,* the military policeman was on joint patrol with civilian police. In *Walden,* the marines acted as "the principal investigators of civilian crimes." (*United States* v. *Walden, supra,* 490 F.2d 372, 377.)

In *People* v. *Burden, supra,* 303 N.W.2d 444, Airman Hall, a member of the United States Air Force, agreed to assist Michigan State Police in an investigation of drug traffic in exchange for dismissal of pending drug charges. The airman's participation in the investigation was approved by the base commander. In the course of his activities for the state police, Hall purchased drugs from defendants. At trial, defendants' motion to exclude the testimony of Hall was granted based on an express finding of violation of the Posse Comitatus Act. The court of appeals affirmed with Judge Walsh dissenting. The Michigan Supreme Court reversed, finding it significant that Hall was acting as a civilian and agreeing with the analysis of Judge Walsh's dissent in the court of

appeals case: "'His military status was merely incidental to and not essential to his involvement with the civilian authorities. He was not in military uniform. He was not acting under military orders. He did not exercise either explicitly or implicitly any military authority. Moreover, Hall was not a regular law enforcement agent of the military, ... nor does the record suggest that Hall's usefulness to civilian authorities was in any way enhanced by virtue of his being a military man. As we read the record, the assistance rendered by Hall was in no way different from the cooperation which would have been given by a private citizen offered the same opportunity to avoid criminal prosecution.'" (*Id.*, at 447.)

A comparison of the facts in *Burden* with those in the instant case supports a conclusion that Gray's cooperation did not constitute a violation of the act. The prohibition of the act does not apply to military personnel who are acting clearly on their own initiative as private citizens. (Meeks, *supra*, pp. 126-127.) For example, it is not a violation of the act for a soldier who witnesses an assault to go to the aid of the victim. Meeks identifies factors which tend to show military rather than individual or "unofficial" assistance, such as aid given during duty hours, assistance provided with the knowledge and acquiescence of a superior, the manner in which the individual in the military is contacted by civilian law enforcement, the individual regularly serves in a military law enforcement capacity, and the individual's usefulness to civilian law enforcement is related to his military status. (*Ibid.*)

Gray had "checked out" of Lemoore Naval Air Station on November 29 or 30 and was on leave at the time of her participation in the buy; she not only assisted in the investigation while off duty, but no evidence was presented that any military personnel approved or was even aware of her participation. Gray's violation of the drug laws, which was the basis of her contact with civilian law enforcement, occurred off base in the Hanford area, and obviously had nothing to do with her military status. Gray was not involved regularly in law enforcement activities with the military, and her usefulness to civil law enforcement, as an informant on fellow drug offenders, was unrelated to the fact that she was a Wave. The evidence of Gray's involvement in the investigation of appellant does not show a violation of the statute.

██ Also, the evidence of cooperation by the NIS in permitting the investigation of appellant to continue on the base does not demonstrate a violation of the act. The record shows only that Osborne informed the

NIS of the investigation and that they provided him, on each occasion, with a pass to enter the base; Osborne evidently needed permission to go on the base for any purpose. There is no evidence that the NIS arranged or participated in a program to detect violation of the civil narcotic laws. Under appellant's theory, a violation of the Posse Comitatus Act would occur every time local law enforcement obtained permission to enter a military base in the course of an investigation, effectively precluding enforcement of the civil law. Such an interpretation of the act is unreasonable. (See *Commonwealth* v. *Shadron* (1977) 471 Pa. 461, 370 A.2d 697, 699-700.)

Unlike the Oklahoma cases criticized in Meeks, at pages 112-113, the record in this case does not show regular and systematic assistance by military investigative agents to civilian law enforcement in the investigation of local drug traffic. (See *Lee* v. *State* (Okla. 1973) 513 P.2d 125; *Hildebrandt* v. *State* (Okla. 1973) 507 P.2d 1323; *Hubert* v. *State* (Okla. 1972) 504 P.2d 1245.)

The trial court correctly found that no violation of the Posse Comitatus Act was shown and properly denied the motion to exclude evidence of the narcotic sales.[6]

■ At trial, appellant's counsel also objected to the admission in evidence of the tape recordings of telephone conversations between Gray

---

[6]We do not reach the question whether imposition of an exclusionary rule is ever an appropriate remedy if the act is violated. The Fourth Circuit in *United States* v. *Walden, supra,* 490 F.2d 372, found no indication of widespread violation of the act or its policy and declined to adopt an exclusionary rule. The court stated that the statute was previously little known, that there was no evidence that the violation therein was deliberate or intentional, that the policy expressed in the Posse Comitatus Act is for the benefit of the nation as a whole, and not designed to protect the personal rights of defendants. Noting that a rationale for adopting an exclusionary rule for Fourth Amendment violations is that available alternative remedies have proved ineffectual, the court expressed confidence that the military would take steps to ensure enforcement of the act. (*Id.,* at pp. 376-377.) The court concluded: "Should there be evidence of widespread or repeated violations in any future case, or ineffectiveness of enforcement by the military, we will consider ourselves free to consider whether adoption of an exclusionary rule is required as a future deterrent." (*Id.,* at p. 377.)

The *Walden* reasoning has been followed in several cases. (See *United States* v. *Wolffs* (5th Cir. 1979) 594 F.2d 77, 84-85; *State* v. *Danko, supra,* 548 P.2d 819; *State* v. *Trueblood* (1980) 46 N.C.App. 541 [265 S.E.2d 662]; *United States* v. *Hartley* (M.D. Fla. 1980) 486 F.Supp. 1348.)

In *People* v. *Brannon* (1973) 32 Cal.App.3d 971 [108 Cal.Rptr. 620], this court found no violation of constitutionally protected interests because of noncompliance with a California statute providing for alcohol tests (Veh. Code, § 13353) so as to require exclusion of the results of the test.)

and appellant and Osborne and appellant on the ground that they were made without appellant's consent in violation of Penal Code section 631. The court ruled that the recordings were admissible under Penal Code section 633, which provides that, "Nothing in Section 631 or 632 shall be construed as rendering inadmissible any evidence obtained by [law enforcement officers] by means of overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter." While appellate counsel repeats the argument urged below, the court's ruling clearly was correct. (See *People* v. *Howard* (1976) 55 Cal.App.3d 373, 378 [127 Cal.Rptr. 527]; *People* v. *Velasquez* (1976) 54 Cal.App.3d 695, 699 [126 Cal.Rptr. 11].)

■ For the first time, appellant now urges on appeal that the first conversation between Gray and appellant was overheard and recorded illegally because Gray's consent was involuntary. Conceding that no objection was made in the trial court on this ground, appellant contends that the trial judge should have inquired *sua sponte* into the voluntariness of Gray's consent. Understandably, appellant cites no authority supporting this proposition. Not only is the objection waived by failure to raise it in the trial court (Evid. Code, § 353, subd. (a); *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Lopez* (1978) 81 Cal.App.3d 103, 108 [146 Cal.Rptr. 165]), but there is no indication in the record that Gray's consent was other than voluntary. Cooperation was not "coerced" merely because Gray, the informant, found it to be in her own best interests to cooperate with those enforcing the law. (*People* v. *Velasquez, supra*, 54 Cal.App.3d 695, 699.)

■ Appellant's final argument concerns his pretrial motion to dismiss, wherein he argued that investigation and prosecution of appellant in a civilian rather than a military forum involved "an invidious discrimination in the enforcement of the laws similar to the type discussed in *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 . . . ." The motion was denied and the case was tried. On motion for new trial, appellant raised, for the first time, a claim that appellant had suffered discriminatory prosecution based on the testimony of Osborne at trial that arrestees routinely were offered the opportunity to cooperate with the narcotic task force in exchange for some type of recommendation regarding the charges against them. Appellant apparently claims that this evidence shows discriminatory prosecution because he refused to turn

informant. The trial court ruled that no discriminatory prosecution had been shown and denied the motion for new trial.

Even assuming that the claim raised for the first time after trial is reviewable and that it could be brought under Penal Code section 1181, subdivision 8 (see *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 293-294, fn. 4 [124 Cal. Rptr. 204, 540 P.2d 44]), the motion was denied properly as no basis for relief was shown. "[I]n order to establish a claim of discriminatory enforcement a defendant must demonstrate that he has been deliberately singled out for prosecution on the basis of some invidious criterion." (*Murgia, supra*, at p. 298.) Appellant's offer of proof clearly was inadequate. (See *People* v. *Milano* (1979) 89 Cal. App.3d 153, 164-165 [152 Cal.Rptr. 318].)

The judgment is affirmed.

Brown (G. A.), P. J., and Franson, J., concurred.