**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

v.

MICHAEL ALLAN DREYER,
    *Defendant-Appellant*.

No. 13-30077

D.C. No.
2:12-cr-00119-MJP-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Chief District Judge, Presiding

Argued and Submitted
May 16, 2014—Seattle, Washington

Filed September 12, 2014

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Kleinfeld;
Partial Concurrence and Partial Dissent by Judge
O'Scannlain

**SUMMARY**[*]

---

### Criminal Law

The panel reversed the district court's denial of a suppression motion, and remanded for further proceedings, in a case in which the defendant was convicted of one count of distributing child pornography and one count of possessing child pornography, and remanded for further proceedings.

A special agent of the Naval Criminal Investigative Service launched an investigation for online criminal activity by anyone in the state of Washington, whether connected with the military or not. The agent found evidence of a crime committed by the defendant, a civilian, in the state and turned it over to civilian law enforcement officials.

The panel reaffirmed that NCIS agents are bound by Posse Comitatus Act-like restrictions on direct assistance to civilian law enforcement, and held that the agent's broad investigation into sharing of child pornography by anyone within the state of Washington, not just those on a military base or with a reasonable likelihood of a Navy affiliation, violated the regulations and policies proscribing direct military enforcement of civilian laws.

The panel held that the exclusionary rule should be applied, and that the district court erred in denying the defendant's motion to suppress, because there is abundant evidence that the violation at issue has occurred repeatedly

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and frequently, and that the government believes that its conduct is permissible, despite prior cautions by this court and others that military personnel, including NCIS agents, may not enforce the civilian laws.

Concurring, Judge Kleinfeld wrote separately to address applicability of the exclusionary rule to this case, which amounts to the military acting as a national police force to investigate civilian law violations by civilians.

Concurring in part and dissenting in part, Judge O'Scannlain concluded that the agent violated the Posse Comitatus Act, but dissented from the majority's application of the exclusionary rule.

### COUNSEL

Erik B. Levin (argued), Law Office of Erik B. Levin, Berkeley, California, for Defendant-Appellant.

Marci Ellsworth (argued), Assistant United States Attorney, and Jenny A. Durkan, United States Attorney, Western District of Washington, Seattle, Washington, for Plaintiff-Appellee.

## OPINION

BERZON, Circuit Judge:

A special agent of the Naval Criminal Investigative Service (NCIS) launched an investigation for online criminal activity by anyone in the state of Washington, whether connected with the military or not. The agent found evidence of a crime committed by a civilian in the state and turned it over to civilian law enforcement officials. The civilian, Michael Dreyer, was prosecuted, convicted, and sentenced to eighteen years in prison. We hold that the NCIS agent's investigation constituted improper military enforcement of civilian laws and that the evidence collected as a result of that investigation should have been suppressed.

## BACKGROUND

In late 2010, NCIS Special Agent Steve Logan began investigating the distribution of child pornography online. Several months later, from his office in Georgia, Agent Logan used a software program, RoundUp, to search for any computers located in Washington state sharing known child pornography on the Gnutella file-sharing network.[1]

Agent Logan found a computer using the Internet Protocol (IP) address 67.160.77.21 sharing several files

---

[1] Dreyer challenges the admission of evidence related to RoundUp, arguing it did not meet the requirements for the admission of expert testimony established by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Because we conclude that suppression was warranted for other reasons, we do not reach this issue.

identified by RoundUp as child pornography.[2]   He downloaded three of the files, two images and a video, from that computer.   After viewing the files, Agent Logan concluded that they were child pornography.

Thereafter, Agent Logan made a request for an administrative subpoena for the name and address associated at the time of the downloads with the IP address.   He submitted his request to NCIS's representative at the National Center for Missing and Exploited Children, which turned the request over to the Federal Bureau of Investigation (FBI). The FBI sent an administrative subpoena to Comcast. Comcast responded by providing Dreyer's name and address in Algona, Washington.

After receiving that information, Agent Logan checked a Department of Defense (DoD) database to determine if Dreyer had a military affiliation.   He found that Dreyer had no current military affiliation.[3] Agent Logan then wrote a report summarizing his investigation and forwarded it and the supporting material to the NCIS office in the state of Washington.   That office then turned the information over to Officer James Schrimpsher of the Algona Police Department.

Officer Schrimpsher verified that Dreyer lived in Algona based on property and utility records.   Because Officer Schrimpsher had never worked on any case involving internet

---

[2] RoundUp identified such files by comparing the "SHA-1 hash values" of files being offered for download – unique identifiers that do not change when a file name is altered – with values already known to be associated with child pornography.

[3] Dreyer had previously been a member of the Air Force.

crimes or child pornography, he contacted the Internet Crimes Against Children Task Force for assistance and was referred to Detective Ian Polhemus of the Seattle Police Department. Detective Polhemus reviewed some of the information in the NCIS report, and provided Officer Schrimpsher with a sample of a search warrant affidavit.

Subsequently, Officer Schrimpsher sought, and was issued, a search warrant by a state court judge.[4] Officer Schrimpsher, along with several other officers, including Detective Polhemus, Detective Timothy Luckie of the Seattle Police Department, and Sergeant Lee Gaskill of the Algona Police Department, executed the search warrant. At Dreyer's residence, Detective Luckie conducted an on-site "preview" search of a desktop computer he found in the house.[5] He identified some images as possible child pornography and directed the Algona officers to seize the computer.

Months later, United States Department of Homeland Security Special Agent Cao Triet Huynh applied for a warrant to search the electronic media seized from Dreyer's home.

---

[4] Officer Schrimpsher prepared the search warrant application. Officer Schrimpsher testified that he attached Agent Logan's report and supporting material to his affidavit. In drafting the affidavit, he copied and pasted large sections of Detective Polhemus's sample. As a result, Officer Schrimpsher made a number of false representations in his affidavit.

Dreyer raises a *Franks* issue regarding the falsities in the affidavit. As we hold suppression was required on other grounds, we do not address this issue.

[5] We do not address Dreyer's contention that the on-site search of his computer exceeded the scope of the state warrant, as we conclude that suppression is appropriate for a different reason.

Huynh based his application on the media found by Agent Logan and Detective Luckie, as well as incriminating statements Dreyer made during the car ride. A federal magistrate judge issued a search warrant. The resulting forensic examination of Dreyer's computer revealed many videos and images of child pornography.

Dreyer was charged with one count of distributing child pornography on April 14, 2011 in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1), and one count of possessing child pornography on July 6, 2011 in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). He moved to suppress the evidence seized during the July 6, 2011 search, as well as the evidence found during the later federal search of the computer.

In his reply brief on his suppression motion, Dreyer argued that, as an NCIS agent, Agent Logan had no lawful authority to investigate civilian crime. The government filed a surreply addressing that argument. The parties addressed this issue again at the hearing on the motion to suppress. Following an evidentiary hearing, the district court orally denied his motion to suppress.

Subsequently, following a four-day jury trial, Dreyer was convicted of both charges and sentenced to 216 months of incarceration and lifetime supervised release. He timely appealed.

## DISCUSSION

Dreyer argues that the fruits of the NCIS investigation into his online file sharing should have been suppressed because military enforcement of civilian laws is prohibited.

Because the issue of whether the NCIS involvement violated the limitations on military enforcement of civilian laws "is a mixed question of fact and law which is primarily legal," we review de novo the district court's denial of Dreyer's motion to suppress based on this claim. *United States v. Hitchcock*, 286 F.3d 1064, 1069 (9th Cir.), *as amended by* 298 F.3d 1021 (9th Cir. 2002).

I.

The Posse Comitatus Act (PCA), 18 U.S.C. § 1385,[6] "prohibits Army and Air Force military personnel from participating in civilian law enforcement activities." *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000).[7]   In

---

[6] The PCA states, "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C. § 1385.

[7] "Posse comitatus (literally 'power of the country') was defined at common law as all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder." H.R. Rep. No. 97-71, pt. 2, at 4 (citing 1 William Blackstone, Commentaries 343-44). Although the PCA itself "was enacted during the Reconstruction Period to eliminate the direct active use of Federal troops by civil law authorities" to enforce the civil law, *United States v. Banks*, 539 F.2d 14, 16 (9th Cir. 1976); *see also United States v. Red Feather*, 392 F.Supp. 916, 921–25 (D. S.D. 1975), it reflected long-standing American concerns about the use of the military to keep the civil peace, *United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974); *see also* The Declaration of Independence paras. 11, 12, 14 (U.S. 1776) (criticizing the King of Great Britain for having "kept among us, in times of peace, Standing Armies without the Consent of our legislatures"; "affected to render the Military

addition, Congress has directed "[t]he Secretary of Defense [to] prescribe such regulations as may be necessary" to prevent "direct participation by a member of the Army, Navy, Air Force, or Marine Corps" in civilian law enforcement activities unless otherwise authorized by law. 10 U.S.C. § 375. Congress has authorized certain exceptions to § 375, such as permitting the military to make equipment and facilities available to civilian law enforcement and allowing the military to provide support in particular situations, such as during an emergency situation involving a weapon of mass destruction. *See* 10 U.S.C. §§ 372-74, 379-82. None of these specific exceptions are at issue here.

We have previously recognized that, "[a]lthough the PCA does not directly reference the Navy," "PCA-like restrictions" apply to the Navy as a matter of Department of Defense (DoD) and Naval policy. *Chon*, 210 F.3d at 993; *see also United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994). Specifically, DoD policy states that its "guidance on the Posse Comitatus Act . . . is applicable to the Department of the Navy and the Marine Corps as a matter of DoD policy, with such exceptions as may be provided by the Secretary of the Navy on a case-by-case basis." DoD Directive (DoDD) 5525.5 Enclosure 4 E4.3 (Jan. 15, 1986).[8] "[T]he Secretary

---

independent of and superior to the Civil power"; and "Quartering large bodies of armed troops among us"); 7 Cong. Rec. 3586 (1878) (remarks of Rep. William Kimmel).

[8] After Agent Logan's actions at issue in this appeal, on February 27, 2013, DoD issued Instruction No. 3025.21, which incorporated the substance of, and cancelled, Directive No. 5525.5. *See* DoD Instruction (DoDI) 3025.21(1)(c). Like the cancelled Directive, Instruction No. 3025.21 also provides, "By policy, Posse Comitatus Act restrictions (as well as other restrictions in this Instruction) are applicable to the

of the Navy, using nearly identical language, has adopted this policy." *Chon*, 210 F.3d at 993 (citing former Secretary of the Navy Instructions (SECNAVINST) 5820.7B (March 28, 1988)); *see* SECNAVINST 5820.7C (Jan. 26, 2006).

The government maintains that, even though PCA-like restrictions apply to the Navy, they do not apply to civilian NCIS agents. *Chon* rejected the same argument. There, as here, the government argued that "§ 375 does not apply to the NCIS because most of its agents are civilians," and "it is headed by a civilian director with a civilian chain of command." *Id.* at 993–94. The government based its first argument on provisions in DoD and Naval policies that

> exempt four categories of people from PCA-like restrictions: (1) members of reserve components when not on active duty; (2) members of the National Guard when not in the Federal Service; (3) civilian employees of DoD unless under the direct command and control of a military officer; and (4) military

---

Department of the Navy (including the Marine Corps) with such exceptions as the Secretary of Defense may authorize in advance on a case-by-case basis." DoDI 3025.21, Enclosure 3(3). The other relevant provisions also remain materially unchanged, except as otherwise indicated later in this opinion.

In addition, on April 13, 2013, the Department of Defense issued a final rule promulgating regulations concerning the restriction on military support of civilian law enforcement. *See* Defense Support of Civilian Law Enforcement Agencies, 78 Fed. Reg. 21826-02 (codified at 32 C.F.R. § 182 (2013)). The rule was originally proposed on December 28, 2010. 75 Fed. Reg. 81547-01. The regulations as issued are largely identical to the DoD Instruction No. 3025.21.

> service members when off duty and in a
> private capacity.

*Id.* at 993. *Chon* interpreted "these exemptions to mean that the PCA and PCA-like restrictions function to proscribe use of the strength and authority of the military rather than use of the private force of the individuals who make up the institution." *Id.* "In other words, while DoD personnel may participate in civilian law enforcement activities in their private capacities, they may not do so under the auspices of the military." *Id.* Applying this understanding, *Chon* held that the PCA-like restrictions do apply to "civilian NCIS agents" who "represented and furthered the interests of the Navy," and were not distinguishable by the civilians who might interact with them from members of the military. *Id.* These same status-based exemptions are maintained in the regulations and policies today. *See* SECNAVINST 5820.7C(8)(e)(1)–(4); DoDD 5525.5, Enclosure 4 E4.2; *see also* 32 C.F.R. § 182.6(a)(2); DoDI 3025.21, Enclosure 3(2). We see no basis for revisiting our prior interpretation of them.

*Chon* also rejected the government's second contention, "that the NCIS should be exempt from PCA-like restrictions because it is headed by a civilian director with a civilian chain of command." 210 F.3d at 993–94. The court reasoned that "the NCIS Director has a direct reporting relationship to the Chief of the Naval Operations, a military officer," and so "[d]espite a civilian Director, the NCIS continues to be a unit of, and accountable to, the Navy." *Id.* The government argues that *Chon*'s reasoning has been undermined, because the "reporting relationship" between the NCIS director and the Chief of Naval Operations "was eliminated in 2005" when the Secretary of the Navy issued Instruction 5430.107.

The government is incorrect. At the time that *Chon* was decided, the command structure of NCIS was set forth in Instruction 5520.3B, which provided, "The Director, NCIS reports directly to the Secretary of the Navy," and "[i]n addition, the Director, NCIS reports to the Chief of Naval Operations for physical, personnel and information security." SECNAVINST 5520.3B(4). Instruction 5430.107 has since cancelled Instruction 5520.3B, *see* SECNAVINST 5430.107(2) (Dec. 28, 2005), and now provides, "The Director, NCIS reports directly to the Secretary of the Navy," and "[i]n addition, the Director, NCIS serves as Special Assistant for Naval Investigative Matters and Security to the Chief of Naval Operations," SECNAVINST 5430.107(5)(a). That the NCIS director still serves as the "Special Assistant" to the Chief of Naval Operations means a reporting relationship continues to exist. In addition, Instruction 5430.107 created a Board of Directors that oversees NCIS strategy and operations; the Board includes several military officers. *See* SECNAVINST 5430.107(5)(c) (establishing Board of Directors including the Vice Chief of Naval Operations and the Assistant Commandant of the Marine Corps). So the change in NCIS's policies regarding its command structure did not undermine this portion of *Chon*'s reasoning.

More fundamentally, the government's assertion that there is a meaningful difference between civilian and other employees of the Navy for the purposes of the PCA-like restrictions is unsound. The DoD policies have consistently proclaimed that they set forth "restrictions on participation of DoD personnel in civilian law enforcement activities." *See* DoDD 5525.5, Enclosure 4; DoDI 3025.21, Enclosure 3. They do not limit their reach to non-civilian personnel only. And any contention to the contrary is belied by the

abundantly clear expressions in the most recent regulations and policy instructions. Both state that they "[a]ppl[y] to civilian employees of the DoD Components," and that their restrictions on direct participation in civilian law enforcement "apply to all actions of DoD personnel worldwide," with "DoD personnel" defined to include "Federal military officers and enlisted personnel and civilian employees of the Department of Defense." 32 C.F.R. §§ 182.2(e), 182.3, 182.4(c); DoDI 3025.21(2)(e), (4)(c), Glossary Part II.[9]

Accordingly, we re-affirm *Chon*'s holding that NCIS agents are bound by PCA-like restrictions on direct assistance to civilian law enforcement.

## II.

The regulations and policies implementing the PCA and § 375 "generally prohibit 'direct' military involvement in civilian law enforcement activities but permit 'indirect' assistance such as the transfer of information obtained during the normal course of military operations or other actions that 'do not subject civilians to [the] use [of] military power that is regulatory, prescriptive, or compulsory.'" *United States v. Hitchcock*, 286 F.3d at 1069 (citations omitted). Prohibited direct assistance includes "[u]se of military personnel for surveillance or pursuit of individuals, or as undercover

---

[9] Although the most recent DoD Instruction and regulations were issued after the search at issue here, their content is largely identical to that contained in the earlier DoD Directive. Also, the Army policy implementing the newer Instruction and regulation is the same one that implemented the earlier Directive. So the DoD's explanations of the intent and meaning of the newer documents is a useful aid into interpreting the earlier ones. *Cf. Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 412 (1972).

agents, informants, investigators, or interrogators."  DoDD 5525.5, Enclosure 4, E4.1.3.4.

We have "set forth three tests for determining whether military involvement in civilian law enforcement constitutes permissible indirect assistance: '[1] The involvement must not constitute the exercise of regulatory, proscriptive, or compulsory military power, [2] must not amount to direct active involvement in the execution of the laws, and [3] must not pervade the activities of civilian authorities.'" *Hitchcock*, 286 F.3d at 1069 (quoting *Khan*, 35 F.3d at 431).[10]  "If any one of these tests is met, the assistance is not indirect." *Khan*, 35 F.3d at 431.

Agent Logan's RoundUp surveillance of all computers in Washington amounted to impermissible direct active involvement in civilian enforcement of the child pornography laws, not permissible indirect assistance.  He acted as an investigator, an activity specifically prohibited as direct assistance.  DoDD 5525.5, Enclosure 4, E4.1.3.4; *see also Red Feather*, 392 F.Supp. at 925 ("Activities which constitute an active role in direct law enforcement" include "investigation of crime . . . and other like activities.").  Agent Logan's actions were akin to the conduct that the Fourth Circuit held violated these regulations in *United States v. Walden*, 490 F.2d 372, 373–76 (4th Cir. 1974), where Marines engaged in undercover investigations into store

---

[10] *Khan* interpreted 32 C.F.R. § 213.10, a regulation that has since been withdrawn.  *See* 58 Fed. Reg. 25,776 (Apr. 28, 1993).  *Hitchcock* recognized that the withdrawn regulation's relevant provisions remained in DoD Directive 5525.5 as it was in effect at the time of the search at issue here.  286 F.3d at 1069–70 n.8.  Those same provisions are maintained in DoD Instruction No. 3025.21 and the new regulations.  *See* 32 C.F.R. § 182.6; DoDI 3025.21, Enclosure 3.

employees' illegal firearms sales to minors and to individuals not residents of the state.

Also, Agent Logan engaged in his investigation not in any support capacity to civilian law enforcement, but rather as an independent actor who initiated and carried out this activity. His actions thus were not "incidental" to the overall investigation into Dreyer, or limited to backup support. *Cf. Khan*, 35 F.3d at 432; *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1259 (9th Cir. 1998). The results of his investigation served as the primary basis for the state search warrant. Officer Schrimpsher conducted no significant additional investigation before procuring the warrant – he only verified that Dreyer lived at the address he was given and that the descriptions that Agent Logan provided of the files seemed to describe child pornography. Without Agent Logan's identification of Dreyer, his computer, and the child pornography on his computer, there would have been no search and no prosecution.

Accordingly, Agent Logan's actions amounted to direct assistance to civilian law enforcement. The government nonetheless argues that Agent Logan's investigation was proper because it falls into the "independent military purpose" exception to the prohibition on direct assistance.

The policies and regulations create "an exception to the general prohibition on direct involvement where" there is "an independent military purpose," that is, "where the military participation is undertaken 'for the primary purpose of furthering a military or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities.'" *Hitchcock*, 286 F.3d at 1069 (quoting DoD Directive 5525.5, Enclosure 4, E4.1.2.1). Such military

activities include "[i]nvestigations and other actions related to enforcement of the Uniform Code of Military Justice." DoD Directive 5525.5, Enclosure 4, E.4.1.2.1.1.

The Uniform Code of Military Justice prohibits distribution of child pornography by a member of the armed forces. It has assimilated the elements of the federal child pornography statute through Article 134, its general provision that prohibits "all conduct of a nature to bring discredit upon the armed forces." 10 U.S.C. § 934; *see, e.g.*, *United States v. Brown*, 529 F.3d 1260, 1263–64 (10th Cir. 2008). In 2011, the President issued Executive Order 13593, adding to the Manual for Courts Martial a specific Article 134 provision for child pornography. Investigation by military law enforcement officers of possession and distribution of child pornography by military personnel is therefore proper.

But Agent Logan's search was not reasonably focused on carrying out such a legitimate military investigation.[11] NCIS is authorized to investigate criminal operations that "significantly affect the naval establishment." SECNAVINST 5430.107(3)(c), 7(b)(2). Agent Logan understood that he did not have the authority to search *any* location, but had to limit his searches to areas where there was "a Department of Navy interest." Yet, Agent Logan's search did not meet the required limitation. He surveyed *the entire state of Washington* for computers sharing child

---

[11] Because Agent Logan's investigation itself violated the PCA-like restrictions, it is irrelevant whether it was permissible for him to transfer to civilian authorities "information collected during the normal course of military training or operations that may be relevant to a violation of any Federal or State law within the jurisdiction of such officials." 10 U.S.C. § 371(a); *see also* DoD Directive 5525.5, Enclosure 2, E.2.1, Enclosure 4, E4.1.7.1; SECNAVINST 5820.7C(5); *Hitchcock*, 286 F.3d at 1069.

pornography. His initial search was not limited to United States military or government computers, and, as the government acknowledged, Agent Logan had no idea whether the computers searched belonged to someone with any "affiliation with the military at all." Instead, it was his "standard practice to monitor all computers in a geographic area," here, *every* computer in the state of Washington.

Agent Logan's further investigation into Dreyer's specific computer and identity also was not reasonably limited to searching for crimes that "significantly affect the naval establishment." SECNAVINST 5430.107(3)(c), 7(b)(2). Agent Logan testified that RoundUp displays the geographic location of the IP address "within a 25- to 30-mile radius." The screen shot for Agent Logan's search shows that RoundUp identified the geographic location for Dreyer's IP address as Federal Way, Washington. Agent Logan did not report at the evidentiary hearing on the suppression motion or at trial that he chose to pursue that IP address based on this geographic identification.

Agent Logan did write in his administrative subpoena request that the "Suspect IP was identified in area of large DOD and USN saturation indicating likelihood of USN/DOD suspect." But the record contains no evidence establishing any meaningful military "saturation" of the area at issue. Although the government represents that Federal Way, Washington is located within thirty miles of several military installations, it also is similarly near both Seattle and Tacoma, as well as much of the surrounding metropolitan areas.[12] The

---

[12] We may properly take judicial notice of United States Census Bureau data, as such data "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid.

three-thousand-square-mile area circling Federal Way – the approximate area of a circle with a thirty-mile radius – encompasses much of the state's civilian population. That Agent Logan ended his investigation once he confirmed that Dreyer had no current military affiliation is of no matter; his overly broad investigation until that point had already exceeded the scope of his authority.

The government's position that the military may monitor and search *all* computers in a state even though it has no reason to believe that the computer's owner has a military affiliation would render the PCA's restrictions entirely meaningless. To accept that position would mean that NCIS agents could, for example, routinely stop suspected drunk drivers in downtown Seattle on the off-chance that a driver is

---

201(b)(2); *see United States v. Esquivel*, 88 F.3d 722, 726–27 (9th Cir. 1996); *Skolnick v. Bd. of Comm'rs of Cook Cnty.*, 435 F.2d 361, 363 (7th Cir. 1970).

The United States Census Bureau's 2011 population estimate for the Seattle-Tacoma-Bellevue Metropolitan Statistical Area was about 3.5 million. *See* U.S. Census Bureau, Annual Estimates of the Population of Metropolitan and Micropolitan Statistical Areas: April 1, 2010 to July 1, 2012, *available at* http://www.census.gov/popest/data/metro/totals/2012/. The Census Bureau estimates that the total state population in that year was about 6.8 million people. *See* U.S. Census Bureau, Annual Estimates of the Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2013, *available at* http://www.census.gov/popest/data/index.html.

Census Bureau data also undermines any notion that Federal Way contains significantly more military personnel than other parts of the country. In 2011, the Census Bureau estimated that about 0.4% of Federal Way's adult population was employed by the Armed Forces, the same percentage as it estimated for the United States population. *See* U.S. Census Bureau, 2011 American Community Survey.

a member of the military, and then turn over all information collected about civilians to the Seattle Police Department for prosecution.

The government's position that the military may search the entire civilian population of a state is also inconsistent with a basic principle underlying the PCA and the related statutes and regulations, "a traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). The PCA was originally enacted on the understandings that "[t]he great beauty of our system of government is that it is to be governed by the people," and that if we use the "military power . . . to discharge those duties that belong to civil officers and to the citizens," we "have given up the character of [our] Government; it is no longer a government for liberty; it is no longer a government founded in the consent of the people; it has become a government of force." 7 Cong. Rec. 4247 (1878) (remarks of Sen. Benjamin Hill). Consistent with those fundamental premises, DoD policy warns against an expansive reading such as the one espoused by the government here: Directive 5525.5 specifically notes that the independent military purpose exception "must be used with caution, and does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of" the PCA. DoDD 5525.5, Enclosure 4, E.4.1.2.1.

The lack of any reasonable connection between the military and the crimes that Agent Logan was investigating separates this case from those in which we have applied the independent military purpose exception. In *Hitchcock*, for example, the defendant "sold LSD to Lake, a U.S. Marine, who was, in turn, selling LSD to other military personnel" on

his base. 286 F.3d at 1066, 1070. NCIS agents participated in the investigation "in order to determine whether [the defendant] had sold drugs to other military personnel besides Lake." *Id.* at 1070. *Hitchcock* held the independent military purpose exception applicable because the military participation was justified to "determin[e] the extent to which [the defendant's] LSD was being used and distributed on the military base" in violation of the Uniform Code of Military Justice, and to help "'maintain law and order on a military installation.'" *Id.* (quoting DoDD 5525.5, Enclosure 4, E4.1.2.1.3). And *Chon* applied the exception where NCIS agents were investigating the theft of military equipment from a Naval facility, and so were acting with "the independent military purpose of recovering military equipment." 210 F.3d at 994.[13]

Thus, we hold that Agent Logan's broad investigation into sharing of child pornography by *anyone* within the state of Washington, not just those on a military base or with a reasonable likelihood of a Navy affiliation, violated the regulations and policies proscribing direct military enforcement of civilian laws.

---

[13] Similar connections to the military existed in the out-of-circuit cases upon which the government relies. In *Hayes v. Hawes*, 921 F.2d 100, 101–04 (7th Cir. 1990), a Navy investigator assisted civilian police investigating drug trafficking in a mall across the street from a Naval base, after a sailor was found with drugs purchased at that mall. And *United States v. Bacon*, 851 F.2d 1312, 1313–14 (11th Cir. 1988), found no violation of the PCA where an army investigator assisted civilian law enforcement "to ferret out a source of some of the cocaine being supplied to both civilians and army personnel."

III.

Having held that Agent Logan's investigation violated the restrictions on the use of the military to enforce civilians laws, we consider whether suppression of the resulting evidence should have been ordered here. We have held that "an exclusionary rule should not be applied to violations of 10 U.S.C. §§ 371–378 until a need to deter future violations is demonstrated." *United States v. Roberts*, 779 F.2d 565, 568 (9th Cir. 1986), *superseded by statute on other grounds as recognized in Khan*, 35 F.3d at 432 n.7. Such a need exists here, as there is evidence of "widespread and repeated violations" of these provisions. *Id.*

The record here demonstrates that Agent Logan and other NCIS agents routinely carry out broad surveillance activities that violate the restrictions on military enforcement of civilian law. Agent Logan testified that it was his standard practice to "monitor[] any computer IP address within a specific geographic location," not just those "specific to US military only, or US government computers." He did not try to isolate military service members within a geographic area. He appeared to believe that these overly broad investigations were permissible, because he was a "U.S. federal agent[]" and so could investigate violations of *either* the Uniform Code of Military Justice or federal law.

The extraordinary nature of the surveillance here demonstrates a need to deter future violations. So far as we can tell from the record, it has become a routine practice for the Navy to conduct surveillance of all the civilian computers in an entire state to see whether any child pornography can be found on them, and then to turn over the information to civilian law enforcement when no military connection exists.

This is squarely a case of the military undertaking the initiative to enforce civilian law against civilians. "There must be an exceptional reason" to invoke the exclusionary rule for violation of posse comitatus-like regulations, *United States v. Harrington*, 681 F.2d 612, 615 (9th Cir. 1982), and the broad use of military surveillance of overwhelmingly civilian populations is an exceptional reason.

Agent Logan carried out these searches repeatedly. He was monitoring another computer at the same time that he found Dreyer's IP address. And he was involved with at least twenty other child pornography investigations. Further, Agent Logan was not the only NCIS agent who engaged in such searches. He began carrying out these searches with two other agents at least several months before he found Dreyer's IP address.[14]

That a need to deter future violations exists is further supported by the government's litigation positions. The government is arguing vehemently that the military may monitor for criminal activity all the computers anywhere in any state with a military base or installation, regardless of how likely or unlikely the computers are to be associated with a member of the military. Such an expansive reading of the military's role in the enforcement of the civilian laws demonstrates a profound lack of regard for the important limitations on the role of the military in our civilian society.

---

[14] We note that in *United States v. Holloway*, 531 Fed. Appx. 582 (6th Cir. 2013), an NCIS agent also carried out an online child pornography investigation that targeted a civilian. As there is no precedential circuit opinion in *Holloway*, *see* 6th Cir. R. 32.1(b); *United States v. Utesch*, 596 F.3d 302, 312 (6th Cir. 2010), we do not discuss it further.

The existence of these factors make this case unlike those in which courts have declined to require suppression of the evidence resulting from a violation of these laws. In *Roberts*, we concluded that suppression was not necessary because the violation there was not widespread or repeated. 779 F.2d at 568. Similarly, in *United States v. Walden*, 490 F.2d 372, 377 (4th Cir. 1974), after holding that the Marines' activities violated the Navy regulations, the Fourth Circuit declined to require suppression, based primarily on "the fact that this case is the first instance to our knowledge in which military personnel have been used as the principal investigators of civilian crimes in violation of the Instruction," and so it was unaware of "any other violation, let alone widespread or repeated violations." And in *United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005), the court held that exclusion would not be appropriate there because there was no evidence in the record that the conduct complained of occurred frequently or even repeatedly.

In contrast, we have here abundant evidence that the violation at issue has occurred repeatedly and frequently, and that the government believes that its conduct is permissible, despite prior cautions by our court and others that military personnel, including NCIS agents, may not enforce the civilian laws. Accordingly, we find that the district court erred in denying Dreyer's motion to suppress.[15]

---

[15] We note that, contrary to the government's repeated representations in its brief and at oral argument that "to date, no court has excluded evidence gathered in violation of the Posse Comitatus Act," at least two courts have done so. In *United States v. Pattioay*, 896 P.2d 911, 925 (Haw. 1995), the Hawaii Supreme Court deemed suppression necessary where "to ignore the violation . . . would be to justify the illegality and condone the receipt and use of tainted evidence in the courts of this state." And *Taylor v. State*, 645 P.2d 522, 524–25 (Okla. Crim. App. 1982),

CONCLUSION

For the reasons set forth above, we reverse the district court's denial of Dreyer's motion to suppress, and we remand to the district court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

KLEINFELD, Senior Circuit Judge, concurring:

I join fully in the majority opinion. I write separately to address applicability of the exclusionary rule to this case. We all agree that the Navy conduct in this case violated the Posse Comitatus policy provisions, though not the criminal Posse Comitatus statute.

Were we suggesting something like application of the exclusionary rule to all Posse Comitatus violations, then application of the exclusionary rule would be inappropriate. And if there were any reason to think that the violation in this case were a fluke, it would be inappropriate. This case, though, amounts to the military acting as a national police force to investigate civilian law violations by civilians.

Generally, the exclusionary rule does not apply to Posse Comitatus violations, in the absence of "widespread and

suppressed evidence obtained in violation of the PCA because under the facts of that case, "the illegal conduct by the law enforcement personnel [rose] to an intolerable level as to necessitate an exclusion of the evidence resulting from the tainted arrest."

repeated violations" demonstrating a need to deter future violations.[1]  In this case, unfortunately, that is just what we have.  The Navy did not just peek into Dreyer's home computer.  It peeked into every computer in the State of Washington using the peer-to-peer file sharing program, "Gnutella."  That is more "widespread" than any military investigation of civilians in any case that has been brought to our attention.  Millions of people use Gnutella, and millions of people live in Washington, so the number of Gnutella users in Washington is likely quite large.  As for being "repeated," the Posse Comitatus violation was repeated against every Gnutella user in Washington.  It does not matter that this is the first case we have seen, and that we do not have repeated circuit court cases.  The offense is to the people in Washington whose computers were hacked by the Navy, not to this court.  The repetition that matters is the repeated invasions of Washingtonians' privacy, as the Navy software went from civilian computer to civilian computer.

We have not found another case in this circuit or our sister circuits applying the exclusionary rule to Posse Comitatus violations, but neither have we found another case in which the violations were so massive.  The cases deeming the exclusionary rule inapplicable are all quite different factually, as in *Roberts*, where a guided-missile frigate with Coast Guard and Navy personnel aboard caught a drug runner on the high seas.  That was one sailboat, not all the computers in the State of Washington using Gnutella.  Military surveillance of all the civilian computers in a state is unique,

---

[1] *United States v. Roberts*, 779 F.2d 565, 568 (9th Cir. 1986).  The same principle applies to violations of the PCA-like regulations that are at issue here.

and distinguishable from all the cases we have found that stop short of applying the exclusionary rule.[2]

The military not infrequently investigates civilians or assists in civilian law enforcement incidentally to military law enforcement. A Navy shore patrol may break up a fight involving sailors at a waterfront saloon, and turn the civilians over to the local police. The Army may investigate a drug ring on base, and turn civilian spouses living on base and off-base civilian participants over to civilian authorities. There would be little reason to deter military law enforcement in cases like those, and indeed they would ordinarily not even be Posse Comitatus violations.[3] This case is different. There could be no bona fide military purpose to this indiscriminate peeking into civilian computers. It should be easy to distinguish this case from run of the mill military law enforcement that incidentally brings about apprehension of civilians.

True, the practical effect of the decision may be to let a criminal go. As Justice Cardozo wrote, application of the exclusionary rule means that "[t]he criminal is to go free because the constable has blundered."[4] We are unlikely to see so widespread and repeated a Posse Comitatus violation from the Army or Air Force, because their military personnel

---

[2] *Cf. Roberts*, 779 F.2d at 568; *United States v. Walden*, 490 F.2d 372 (4th Cir. 1974).

[3] *Cf. United States v. Hitchcock*, 286 F.3d 1064 (9th Cir. 2002); *United States v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000); DoD Directive 5525.5, Enclosure 4, E4.1.2.1.

[4] *People v. DeFore*, 242 N.Y. 13, 21 (1926).

would risk prison.[5]  If the military chooses to become a national police force to detect civilians committing civilian crimes, the Navy would be the branch to use, because the criminal penalty does not apply to Navy personnel.  Without the criminal penalty, the exclusionary rule is about all that the judiciary has to deter such widespread and repeated Posse Comitatus violations as we have here.  Letting a criminal go free to deter national military investigation of civilians is worth it.

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

Before today, "not a single federal court" had applied the exclusionary rule to violations of the Posse Comitatus Act (PCA), 18 U.S.C. § 1385, and its implementing regulations.[1] *United States v. Vick*, 842 F. Supp. 2d 891, 894 (E.D. Va. 2012).  That is no accident.  As we have observed, the exclusionary rule is an "extraordinary remedy," *United States v. Roberts*, 779 F.2d 565, 568 (9th Cir. 1986), and the Supreme Court has counseled that it is only to be used as a "last resort," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).  Yet, in a breathtaking assertion of judicial power, today's majority invokes this disfavored remedy for the benefit of a convicted child pornographer.  It does so without any demonstrated need to deter future violations of the PCA and

[5] *See* 18 U.S.C. § 1385.

[1] To avoid cumbersome constructions, I will not distinguish between the PCA and its implementing regulations, except where it is necessary to do so.

without any consideration of the "substantial social costs" associated with the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 907 (1984). Like my colleagues, I conclude that Agent Logan violated the PCA, and I concur in Parts I and II of the majority opinion. But I respectfully dissent from the majority's misbegotten remedy for that violation.

I

The exclusionary rule is "a judicially created remedy of [the Supreme Court's] own making" whose "sole purpose" is "to deter misconduct by law enforcement." *Davis v. United States*, 131 S. Ct. 2419, 2427, 2432 (2011) (internal quotation marks omitted). That is a worthy objective, but it "exacts a heavy toll on both the judicial system and society at large." *Id.* at 2427. Exclusion "undeniably detracts from the truthfinding process and allows many who would otherwise be incarcerated to escape the consequences of their actions." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364 (1998). The rule's "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis*, 131 S. Ct. at 2427; *see also Hudson*, 547 U.S. at 591 (stating that the costs of exclusion "sometimes include setting the guilty free and the dangerous at large").

For these reasons, the Supreme Court has, since the 1970s, "imposed a more rigorous weighing of [the exclusionary rule's] costs and deterrence benefits." *Davis*, 131 S. Ct. at 2427. Gone are the days when courts imposed the exclusionary rule in a manner that was "not nearly so discriminating." *Id.* Under current doctrine, the important and significant costs of the rule "present[] a high obstacle for those urging [its] application." *Scott*, 524 U.S. at 364–65.

In short, exclusion is "our last resort, not our first impulse." *Hudson*, 547 U.S. at 591.

## II

Our precedents reflect this skeptical view of exclusion with regard to violations of the PCA.[2]  In *United States v. Roberts*, we held that the exclusionary rule should not be applied to evidence obtained as a result of a PCA violation "until a need to deter future violations is demonstrated." 779 F.2d at 568.  Such a demonstration requires a showing of "widespread and repeated violations" of the PCA.  *Id.*

In announcing this rule, we adopted the approach of the Fourth and Fifth Circuits in *United States v. Walden*, 490 F.2d 372, 376–77 (4th Cir. 1974), and *United States v. Wolffs*, 594 F.2d 77, 84–85 (5th Cir. 1979).  Significantly, none of those three cases applied the exclusionary rule to violations of the PCA, and all three referred to the exclusionary rule as an "extraordinary remedy."  *Roberts*, 779 F.2d at 568; *Wolffs*, 594 F.2d at 85; *Walden*, 490 F.2d at 377. Indeed, in *Roberts*, we "consider[ed] it significant that courts have uniformly refused to apply the exclusionary rule to evidence seized in violation of the Posse Comitatus Act." 779 F.2d at 568.

Before today, that description remained true of federal courts.

---

[2] Other courts of appeals have recognized that the Supreme Court's description of the exclusionary rule in the Fourth Amendment context applies to PCA cases.  *See, e.g.*, *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995).

## III

As the foregoing survey of Supreme Court and Ninth Circuit precedent makes clear, the application of the exclusionary rule to violations of the PCA is not automatic. Rather, it is assessed by considering whether "the clear costs of applying an exclusionary rule" are outweighed by "any discernible benefits." *Id.* This case demonstrates that the costs of exclusion substantially outweigh the evanescent benefits. Indeed, it is not a close call.

## A

Any evaluation of whether to apply the exclusionary rule to PCA violations must take into account the significant costs of exclusion. In *Walden*, the Fourth Circuit believed that the facts of the case before it were particularly useful in highlighting the costs of exclusion. The Fourth Circuit thought it significant that "the evidence of [the] defendant's guilt [wa]s overwhelming" and that application of the exclusionary rule would have suppressed "the bulk of the evidence" against the defendant. 490 F.2d at 376. The possibility of setting free a convicted felon was a troubling cost of exclusion, and because there was no need to deter future violations, nothing justified incurring such costs. *Id.* at 376–77; *see also United States v. Jones*, 13 F.3d 100, 104 (4th Cir. 1993) (recognizing that setting free guilty defendants is a cost courts should consider in determining whether to apply the exclusionary rule to PCA violations).

In Dreyer's case, a jury convicted him of possession and distribution of child pornography. As in *Walden*, the evidence of guilt is overwhelming. Using specialized software called RoundUp, Agent Logan searched the state of

Washington for computers trafficking in child pornography on the Gnutella file-sharing network. Maj. op. at 4. The software identified a computer bearing the Internet Protocol (IP) address 67.160.77.21 as offering several files of known child pornography to fellow Gnutella users. *Id.* at 4–5. We know that the files contained child pornography because they bear unique identifiers—called "SHA-1 hash values"—that match the identifiers of known child pornography files contained in a database maintained by RoundUp and the National Center for Missing and Exploited Children. *Id.* at 5 The IP address offering child pornography belonged to Dreyer. *Id.* Agent Logan, using a method that permitted him to ensure that he was downloading files only from Dreyer's computer, downloaded two images and a video, which, upon review, he confirmed contained child pornography. *Id.* Subsequent searches of Dreyer's seized hard drives revealed several such files. *Id.* at 6–7. There can be little doubt, then, that Dreyer trafficked in child pornography, an activity that is "intrinsically related to the sexual abuse of children." *New York v. Ferber*, 458 U.S. 747, 759 (1982).

Application of the exclusionary rule would suppress all evidence obtained by Agent Logan. Moreover, as the majority opinion observes, without the evidence obtained by Agent Logan, it is probable that "there would have been no [subsequent] search[es] and no prosecution." Maj. op. at 15. Thus, application of the exclusionary rule to the allegedly tainted evidence and its fruits is likely to result in a convicted child pornographer being released from prison.

It is impossible to state this conclusion without feeling its gravity. In this context, the Supreme Court's warning against unnecessarily "setting the guilty free and the dangerous at large" should give any jurist pause. *Hudson*, 547 U.S. at 591.

Yet, such a result would not be uncommon if we were to begin applying the exclusionary rule to PCA cases. Thus, the costs of exclusion are high.

B

Despite this cost, application of the exclusionary rule might still be justified if there were evidence of "widespread and repeated violations" of the PCA.[3] *Roberts*, 779 F.2d at 568. On this record, there is not.

The majority opinion primarily focuses on Agent Logan's ostensible violations of the relevant regulations applying the PCA to the Navy. Maj. op. at 21–22. But the actions of one agent—no matter how egregious—do not show that violations are widespread. Agent Logan's descriptions of his own practices are, therefore, of limited relevance.

Perhaps recognizing the thinness of this evidence, the majority opinion also points out that Agent Logan "began carrying out these searches with two other agents at least several months before he found Dreyer's IP address." *Id.* at

---

[3] *Roberts* implied that application of the exclusionary rule in the PCA context could be justified, and I do not question that conclusion here. 779 F.2d at 568. However, I note that there is a strong argument to be made that exclusion is *never* justified for violations of the PCA. Several considerations might support such an argument, such as (1) the fact that Congress could have provided for exclusion had it thought such a remedy was appropriate; (2) the PCA provides for its own enforcement through criminal sanctions, *see* 18 U.S.C. § 1385; and (3) "the [PCA] express[] a policy that is for the benefit of the people as a whole, but not one that may fairly be characterized as expressly designed to protect the personal rights of defendants," *Walden*, 490 F.2d at 377. However, even assuming that the exclusionary rule *could* be applied to the PCA context, I believe we do not yet have a reason to do so.

22.  It also references another supposed violation in Kentucky.  *Id.* at 22 n.14.  I fail to see how evidence that four agents committed violations—three of whom were part of the same investigative team—demonstrates a widespread problem.  Such anecdotal evidence falls far short of what our precedents require before we will resort to the "extraordinary remedy" of exclusion, especially considering the cost of doing so in this case.  *Roberts*, 779 F.2d at 568.  Indeed, at least one of our sister circuits rejected exclusion in the face of similarly scattershot evidence.  When the Eleventh Circuit was confronted with five alleged violations of the PCA *within the same circuit* over a ten-year period, it concluded that this amounted to only a "few" incidents that provided "no basis" for applying the exclusionary rule.  *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1478 n.9 (11th Cir. 1992), *abrogated on other grounds as recognized by United States v. Rainey*, 362 F.3d 733, 735 (11th Cir. 2004).  The argument in favor of exclusion is no more compelling on the record before us.

Finally, the majority opinion cites the government's litigating position in this case as evidence of "a profound lack of regard for the important limitations on the role of the military in our civilian society."  Maj. op. at 22.  Regardless of whether that observation is true, it does nothing to show that there have, in fact, been widespread and repeated violations of the PCA; it simply shows that the government wanted to win this case and put forward the best arguments it could to justify what Agent Logan did here.  From the premise that the government believes it has a certain power, it does not follow that the government routinely exercises that power.  The government's litigating position is, therefore, irrelevant to the *Roberts* inquiry.

Thus, far from having "abundant evidence that the violation at issue has occurred repeatedly and frequently," Maj. op. at 23, we have before us a paucity of evidence that does not come close to overcoming the "high obstacle for those urging application of the [exclusionary] rule." *Scott*, 524 U.S. at 364–65.

IV

Given the significant costs of exclusion in PCA cases, as well as the meager evidence of PCA violations contained in the record, I would hold that the violation at issue here does not merit application of the exclusionary rule.[4] The majority opinion's contrary holding ignores the Supreme Court's clear teaching on exclusion, our own precedents' stringent test for application of that extraordinary remedy, and the uniform rejection of exclusion by federal courts in the PCA context. Because this case provides no justification for setting a convicted child pornographer free, I respectfully dissent.

---

[4] As for Dreyer's remaining claims, although I would affirm the district court across the board, I limit my discussion here to the issue addressed by the majority opinion.