BERZON, Circuit Judge,
joined by REINHARDT, Circuit Judge,
concurring:
I join fully in the majority opinion. I write separately to explain why I am comfortable with the holding that suppression is not warranted, although the panel opinion I authored held otherwise. See United States v. Dreyer, 767 F.3d 826, 835-37 (9th Cir.2014).
As a preliminary matter, when the case was before our three-judge panel, • the United States never contested that the exclusionary rule could apply to widespread and repeated violations of the PCA. The United States did not make this argument for good reason. Roberts held to the contrary, stating that the exclusionary rule can be “applied to violations of 10 U.S.C. §§ 371-78 [if] a need to deter future violations is demonstrated,” but should not be applied where there is no such showing. 779 F.2d at 568; see also United States v. Johnson, 410 F.3d 137, 149 (4th Cir.2005); Hayes v. Hawes, 921 F.2d 100, 104 (7th Cir.1990); United States v. Wolffs, 594 F.2d 77, 85 (5th Cir.1979).
Addressing, now, the avabability of suppression as' a remedy for violations of the PCA (and PCA-like restrictions), I emphasize' that the PCA is deeply grounded in constitutional principles. The United States’ interest in checking mbitary encroachments into civilian affairs finds expression in the earliest founding documents. See Charles Dpyle, Cong. Research Serv., 95-964 S, The Posse Comitatus Act and Related Mat-térs: The Use of the Military to Execute Civilian Law 1-6 (2000). When the colonists set out to win independence from King George, their resentment of the Crown’s use of troops to enforce customs laws and maintenance of standing armies *1282 became a rallying cry. See H.R.Rep. No. 97-71, pt. 2, at 1799 (1981) (statement of Rep. Conyers); Laird, 408 U.S. at 19, 92 S.Ct. 2318 (Douglas, J., dissenting). The Declaration of Independence denounces the King for having “kept among us, in times of peace, Standing Armies without the Consent of our legislatures”; for “affecting] to render the Military independent' of and superior to the Civil power”; and for “[q]uartering large bodies of armed troops among us.” The Declaration of Independence paras. 11, 12, 14 (U.S. 1776); see 7 Cong. Rec. 3583-86 (1878) (remarks of Rep. Kimmel).
These grievances were at the forefront of deliberations at the Constitutional Convention, as the founders were reluctant to ratify a constitution that failed to guard against military dominance. Laird, 408 U.S. at 22-23, 92 S.Ct. 2318 (Douglas, J., dissenting); Major Clarence I. Meeks III, Illegal Law Enforcement: Aiding Civil Authorities in Violation of the Posse Com-itatus Act, 70 Mil. L.Rev. 83, 87 (1975). The Constitution that emerged incorporates their concerns through the separation of Congress’s power to raise and support the Army and to provide and maintain a Navy, in Article I, Section 8, from the President’s power as the Commander-in-Chief, in Article II, Section 2. The Domestic Violence Clause, Article IV, Section Four, provides for military defense of the states upon invasion and, “on Application of the Legislature, or 'of the Executive (when the Legislature cannot be convened) against domestic Violence”; the military can restore law in the states in the face of domestic disruption, but only upon a determination by Congress (or, in an emergency, the Executive) that military involvement is necessary. See 7 Cong. Rec. 4240 (remarks of Sen. Kernan).
The Bill of Rights also incorporates the principle of separating military force from civilian law. The Second Amendment provides for a civilian militia; the Third Amendment prohibits the mandatory quartering of troops; and the Fourth Amendment prohibits unreasonable government intrusion in the form of searches and seizures. See Laird, 408 U.S. at 15-18, 22-23, 92 S.Ct. 2318 (Douglas, J. dissenting); Doyle, supra, at 12; cf. Bissonette v. Haig, 800 F.2d 812, 814-15 (8th Cir.1986) (en banc), aff'd on other grounds by 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988), abrogated on other grounds as recognized in Engleman v. Deputy Murray, 546 F.3d 944, 948 & n. 3 (8th Cir.2008) (holding that plaintiffs who alleged that they were seized by the Army in violation of the PCA had stated a Fourth Amendment claim). Indeed, “it is not unreasonable to believe that our Founders’ determination to guarantee the preeminence of civil over military power was an important element that prompted adoption of the Constitutional Amendments we call the Bill of Rights.” Laird, 408 U.S. at 23, 92 S.Ct. 2318 (Douglas, J., dissenting) (quoting Earl Warren, The Bill of Rights and the Military, 37 N.Y.U. L.Rev. 181, 185 (1962)).
In 1878, when Congress was considering enacting the PCA, its members repeatedly referred to these constitutional concerns. See 7 Cong. Rec. 3583 (remarks of Rep. Kimmel) (“In every page of the history of the earlier period, long before, at the time of, and long after the adoption of the Constitution, the warnings against the dangers of standing armies are loud, distinct, and constant.”); id. at 4240 (remarks of Sen. Kernan) (“I suppose no one claims that you can use the Army as a posse comitatus unless that use is authorized by the Constitution, which it clearly is not, or by act of Congress”); id. at 4243 (remarks of Sen. Merrimon) (“The Army, under the Constitution, is not to be used for the purpose of executing the law in the ordinary sense of executing the law. It can *1283 only be called into active service for the purpose of . suppressing insurrection .... ”). As these comments evince, when Congress enacted the PCA, it understood that the Act implemented a principle already embedded in the Constitution. See United States v. Walden, 490 F.2d 372, 375 (4th Cir.1974).
Moreover, while it is true that courts generally have in the past applied the exclusionary rule only to statutory violations directly implicating the Fourth or Fifth Amendments, Sanchez-Llamas v. Oregon, 548 U.S. 331, 348-49, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006); see, e.g., Miller v. United States, 357 U.S. 301, 313—4, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); McNabb v. United States, 318 U.S. 332, 344-45, 63 S.Ct. 608, 87 L.Ed. 819 (1943), as Roberts and other PCA cases reflect, there is no reason why the rule should not be applied to the violation of a statute with such a substantial constitutional foundation. Because of the PCA’s constitutional roots, I continue to agree that were an “extraordinary” violation shown, suppression would be warranted. See Roberts, 779 F.2d at 568.
I also continue to believe the violation here was extreme in scope, in that, without connection to a military purpose, the investigation reached all computers in the state of Washington running the Gnutella file-sharing network, and similar investigations have occurred in other parts of the United States. Dreyer, 767 F.3d at 827-28, 833-35, 836 & n. 14. But because the same variety of case has not arisen before and the Navy assured .us at oral argument that its policy has changed, it is not clear that suppression is necessary on the facts of this case. That is, although the violations were widespread, repeated violations have not been shown, cf. Walden, 490 F.2d at 373 (“[Bjecause this case presents the first instance of which we are aware in which illegal use of military personnel in this manner has been drawn into question, we decline to impose the extraordinary remedy of an exclusionary rule at this time.... ”), and therefore it is not clear that suppression is necessary to deter future violations. Roberts, 779 F.2d at 568. If, however, the same or closely similar violations were to occur, suppression would be the appropriate remedy.